**UNITED STATES of America**

v.

**Richard David BLACKSTON, Samuel Brantley, Alfred R. Canas, James Murray, Clarence Outler, Clifford Washington, Carroll Barrett Zeigler.**

Crim. No. CR 482–13.

United States District Court,
S. D. Georgia,
Savannah Division.

Sept. 13, 1982.

Asst. U. S. Attys. William H. McAbee, II and W. Leon Barfield, Savannah, Ga., for plaintiff.

Joel Bailey, Beaufort, S. C., for Blackston.

Public Defender Davis Cohen, Savannah, Ga., for Brantley.

James H. Moss, Beaufort, S. C., for Canas.

John R. Calhoun, Savannah, Ga., for Murray.

Robert E. Robinson, Savannah, Ga., for Outler.

Asst. Public Defender Martin C. Puetz, Augusta, Ga., for Washington.

Clyde M. Taylor, Jr., Tallahassee, Fla., for Zeigler.

## MEMORANDUM OPINION AND ORDER

ANTHONY A. ALAIMO, Chief Judge.

On February 19, 1982, the above-named defendants were indicted, along with twelve others, for various violations of the Comprehensive Drug Abuse Prevention and Control Act of 1970.[1] 21 U.S.C. § 801 et seq. Prior to trial, numerous defendants pleaded guilty and they provided severely damaging testimony against their former compatriots. Nine defendants went to trial, which commenced on the morning of April 19, 1982. The jury was sequestered throughout the trial. The trial lasted for five days and the jury began its delibera-tions during the afternoon of April 24. The jury deliberated for one and a half days, finally arriving at a verdict during the evening of April 25. The above-named defendants were found guilty of all crimes for which they were charged. Two defendants, Jerry Zeigler and James Thomas Sullivan, Jr., were found not guilty.[2]

As is common in multiple-defendant drug trials in which the evidence of guilt is strong, defense counsel vigorously made motions, prior to and during trial, on matters such as the propriety of joinder, the admissibility of various items of evidence and the form of the jury instructions. The Court denied most of these motions. Defendants Blackston, Canas, Brantley, Washington and Zeigler have now renewed many of their earlier objections and have moved, pursuant to Fed.R.Crim.P. 29(c) and 33, for judgment of acquittal or a new trial. New grounds, all of which relate to matters occurring in the courtroom, have also been raised. Oral argument on the sufficiency of all these grounds was held by the Court on June 8, 1982. Having given careful consideration to each ground, the Court DENIES the defendants' motions for the reasons expressed below.[3]

These same defendants have also challenged the propriety of the jury's verdict. They allege that the sanctity of the deliberative process was violated by several coercive or otherwise prejudicial influences reaching the jury. Two in camera hearings were conducted by the Court to ascertain the extent of any jury breach. The Court concludes that there was some impropriety disclosed by a conversation between a Deputy United States Marshal and one of the

---

1. 21 U.S.C. § 848 (continuing criminal enterprise)—Blackston; 21 U.S.C. § 963 (conspiracy to import)—Blackston, Canas; 21 U.S.C. § 848 (conspiracy to possess with intent to distribute) —Blackston, Zeigler, Outler; 21 U.S.C. § 841 (possession with intent to distribute)—Blackston, Murray, Zeigler, Outler, Washington, Brantley.

2. Zeigler had been charged with both conspiracy to import (Count II) and conspiracy to possess with intent to distribute (Count III), but the latter charge was dropped by the Govern-ment prior to submission of the case to the jury. Sullivan had been charged with possession with intent to distribute (Count V).

3. Explicit consideration is given to those grounds either briefed by the defendants, argued during the oral hearing or considered serious by the Court. To the extent that other grounds for upsetting the convictions were raised by the defendants, yet not treated in this Opinion, post-conviction relief predicated on such grounds is DENIED.

jurors. However, after a thorough review of the case law in this area, and with due regard for the important policy considerations underlying the rules on a juror's competency to impeach a verdict, the Court objectively determines that the extrinsic communication did not create the possibility for prejudice that would require a new trial and, thereby, DENIES the motion on this ground.

## I. DISCUSSION

### A. *Sufficiency of the Evidence*

Defendant Alfred Canas has challenged his conviction for conspiring to import marijuana on the grounds of insufficient evidence. The Court, however, thinks there was substantial evidence to convict Canas, and DENIES the motion.

Whether a case is based on direct or circumstantial evidence, the standard to apply in deciding a motion for judgment of acquittal is whether reasonable minds can conclude that the evidence is inconsistent with any hypothesis of the accused's innocence. *U. S. v. Moschetta,* 673 F.2d 96, 99 (5th Cir. 1982); *U. S. v. MacPherson,* 664 F.2d 69, 73 (5th Cir. 1981); *U. S. v. Wieschenberg,* 604 F.2d 326, 330 (5th Cir. 1979). The evidence must be reviewed in the light most favorable to the Government, *U. S. v. Whitmire,* 595 F.2d 1303 (5th Cir. 1979), and if there is substantial evidence to support the jury's verdict, that verdict must be sustained. *Glasser v. U. S.,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Finally, it should be noted that to prove a 21 U.S.C. § 963 violation, this Circuit only requires proof of a knowing agreement to commit the substantive drug-related offense; proof of an overt act is unnecessary. *U. S. v. Anderson,* 651 F.2d 375, 379 (5th Cir. 1981).[4]

The Government produced two witnesses who conclusively implicated Canas in drug-smuggling schemes. Frank Senior, III, testified that in early September of 1980 he went down to Canas' Key West, Florida, home to plan and prepare for a drug-smuggling venture to Colombia aboard the shrimp boat "Miss Mary." He was present during a conversation with co-conspirator Chester Sudal and Canas, wherein the three discussed code signals to be used during the radio communications between the "Miss Mary" and a radio base-station in Key West. During the conversation, Senior learned that Canas was to install a short-wave radio on the boat and man the base-station. Senior also testified that, although the "Miss Mary's" radio malfunctioned four days into the voyage, prior to the breakdown he did hear Canas' voice during twice-daily conversations with the mainland.

Senior's testimony was supported by the testimony of coconspirator William W. Welch, Jr. Welch indicated that he was also at the Canas home during August and September, 1980, and discussed with Canas preparations for the smuggling venture. He detailed the intricacy of the code system Canas had worked out: a code which included euphemisms for such acts as loading a ship with marijuana—"a party." The details of the code demonstrate Canas was not an unwitting partner in the "Miss Mary" operation but knew precisely the object of the voyage. Welch also testified to a similar role played by Canas in a drug-smuggling operation with the shrimp boat "Lady Lynn" in November, 1980. Welch and Canas discussed radio communication details for that venture in a Cape Canaveral hotel room.

Canas, however, contends that there was no legal evidence to show that the conspirators in each venture intended the marijuana to arrive in America; rather, he claims they intended only to dispose of the drugs in the Bahamas, without any knowledge about its further destination. The evidence indicates that the drugs stored on the "Miss Mary" were jettisoned off the coast of the Bahamas, after the ship was spotted by a Coast Guard reconnaissance plane; and the drugs transported by the "Lady Lynn" on her November, 1980, mission were transferred

---

4. Fifth Circuit opinions handed down prior to September 30, 1981, are binding precedent in this Circuit. *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206 (11th Cir. 1981).

to pleasure boats off the Bahamas' coast. Yet, Frank Senior testified that coconspirator Chester Sudal told him during the existence of the conspiracy that the "Miss Mary" was to rendezvous with pleasure yachts off the coast of the Bahamas, where the drugs were to be transported for eventual distribution in Florida. This statement was made by a coconspirator in furtherance of the conspiracy and clearly shows, at least regarding the "Miss Mary" load, the conspirators' intent to import into the United States. Fed.R.Evid. 801(d)(2)(E); *see U. S. v. James,* 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Welch also testified that he had been told by the men who unloaded the "Lady Lynn" load that the drugs were destined for Florida. Moreover, the evidence indicates that the small craft which picked up the drugs were American vessels, inferring that the drugs were headed for the United States.

The above-recited evidence clearly shows Canas' knowing participation in at least one conspiracy to import marijuana into the United States, and his motion is DENIED.

### B. *Venue*

Defendants Blackston, Zeigler, Brantley and Washington seek reversal of their convictions for possession of marijuana with intent to distribute (Count V) on the ground of improper venue. They claim that the evidence adduced at trial showed that the facts and circumstances surrounding Count V occurred solely within Frogmore, South Carolina, and since the marijuana at issue was never proved to have been located within the Southern District of Georgia, the crime could not have been committed here. Thus, venue was improper.

■ The defendants are in error, however, in concentrating on the location of the *marijuana* in determining the proper venue for a 21 U.S.C. § 841 violation. The crime of possession of illegal narcotics with intent to distribute is a continuing offense, and may be tried in any district where the *defendants* were even temporarily located, as long as the Government proves, by a pre-

ponderance of the evidence, that *the defendants had knowing possession* of the narcotics and the intent to distribute them while there. *U. S. v. Davis,* 666 F.2d 195, 199 (5th Cir. 1982). Possession need not be actual, but may be constructive. A defendant is in constructive possession of contraband if he has dominion or control over it or over the instrument which contains it. *U. S. v. Salinas-Salinas,* 555 F.2d 470, 473 (5th Cir. 1977). Most importantly, this Court can find no case holding that constructive possession is abrogated by jurisdictional boundaries. A party may have constructive possession of an object, even though it lies across jurisdictional lines. *See U. S. v. Williams,* 503 F.2d 50, 51–53 (6th Cir. 1974).

■ In the instant case, the Government showed that the defendants had joint control over the marijuana in Frogmore, even when *they* were in Chatham County, and their ultimate objective in gaining that control was eventual distribution. Therefore, venue was properly laid in this district.

### C. *Severance*

Motions for severance were made prior to and throughout the trial by numerous defendants. Fed.R.Crim.P. 14. These motions were denied. Defendants Canas, Zeigler, Brantley and Washington cite the denial of their respective motions as error warranting a new trial. The Court disagrees.

These defendants based their severance motions on a perceived spillover effect from being tried with defendant Blackston, who was charged not only with conspiring to smuggle narcotics and possession of narcotics but also with conducting a continuing criminal enterprise, which requires proof of at least three narcotics violations. *See U. S. v. Phillips,* 664 F.2d 971, 1013 (5th Cir. 1981). Their assertion was that the quantity of evidence against them individually would be *de minimis* in relation to the evidence introduced against Blackston, that the jury would be unable to restrict the consideration of the Blackston evidence with reference to the charges against

Blackston only and, ultimately, the spillover would result in prejudice.

The general rule is that persons jointly indicted should be tried together. *U. S. v. Bolts,* 558 F.2d 316, 322 (5th Cir.), *cert. denied,* 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977). Severance, therefore, is "granted only when the defendant can demonstrate *compelling* prejudice which the trial court [can]not alleviate." *U. S. v. Grapp,* 653 F.2d 189, 193 (5th Cir. 1981) (emphasis added). When the argument for severance is based on a claim of disparity of evidence, severance is justified "only in the *most extreme cases,* and only where the prejudice flowing from a joint trial is clearly beyond the curative powers of a cautionary instruction." *Bolts, supra,* 558 F.2d at 323 (emphasis added).

The facts of this case closely parallel those of the *Bolts* case. There, the appellant was jointly tried for conspiracy to import narcotics along with an alleged co-conspirator, who was also being tried on two importation counts and a continuing criminal enterprise count. The court characterized the evidence against the alleged kingpin as "ample" and said of the appellant that, while his "role was not as exhaustively described at trial, he was also directly implicated by the testimony." *Id.* at 319. The trial court gave a cautionary instruction concerning the treatment of the evidence against the alleged kingpin, and the Fifth Circuit considered this action adequate to prevent prejudice under the circumstances of the case. *Id.* at 321. *Bolts* clearly suggests that the mere fact that someone charged with conducting a continuing criminal enterprise is tried with individuals charged with lesser narcotics offenses does not automatically present the type of extreme case entitling the latter group to separate trials. In the instant case, while the evidence against Blackston could be characterized as overwhelming, there was also much evidence directly implicating Zeigler, Brantley, Washington and Canas. Moreover, the Court gave strong cautionary instructions to the jury that the evidence against a codefendant should not be considered when deliberating about another defendant. Finally, the Court notes that the jury acquitted two of the nine defendants tried in the case, thereby indicating that they were able to sift through the evidence and weigh the quantity and quality of evidence against each individual defendant.

Defendant Canas also argued that he was additionally prejudiced by his inability to call codefendants Blackston and Carroll Zeigler. These defendants chose not to take the stand at trial. Canas asserted that it was his intention to call these two men to testify and that, had they testified, they would have rebutted the evidence showing Canas' knowledge and participation in a drug-smuggling conspiracy. Both Blackston and Zeigler submitted unsworn statements to the effect that, if Canas were tried separately, they would each testify that Canas never entered into an agreement with either of them to import narcotics. Prior to trial, but after the jury was sworn, both men were asked under oath whether they would testify at a separate trial as they had indicated in their statements. Zeigler's answers were ambiguous, at best. Blackston did suggest he would testify as he had outlined in his statement.

The Court holds that, even if both men would have testified at a separate trial consistent with the statements, Canas' inability to present such testimony did not cause sufficient prejudice to warrant a new trial. A criminal defendant is not entitled to a trial which guarantees to him "every item of evidence he would like to offer, but one which meets constitutional standards of due process." *Byrd v. Wainwright,* 428 F.2d 1017, 1021 (5th Cir. 1970). In *Byrd,* the Fifth Circuit established a three-part inquiry for the trial court in deciding whether to sever a trial based on the movant's desire to offer exculpatory testimony of a codefendant. The defendant must show (a) a desire to have the codefendant testify; (b) the exculpatory nature of the proposed testimony; and (c) the likelihood that the codefendant will be willing to testify. *Id.* at 1019–1022. Elaborating on the

second inquiry, the *Byrd* court stated that a trial court may inquire "into the credibility or weight of the potential testimony...." The Court instructed, "[c]redibility is for the jury, but the judge is not required to sever on patent fabrications. If the testimony is purely cumulative, or of negligible weight or probative value, the court is not required to sever." *Id.* at 1021.

Furthermore, the Fifth Circuit also indicated that, when testing for probative value, the trial judge "may also consider whether the testimony of the codefendant is 'contrary to his own penal interest.'" *U. S. v. Alfonso,* 552 F.2d 605, 616 (5th Cir.), *cert. denied,* 434 U.S. 857, 98 S.Ct. 179, 54 L.Ed.2d 129 (1977), *quoting U. S. v. Alejandro,* 527 F.2d 423, 428 (5th Cir.), *cert. denied,* 429 U.S. 844, 97 S.Ct. 124, 50 L.Ed.2d 115 (1976). In those cases, the codefendant had been "caught redhanded" and "his effort to absolve his codefendant cost him nothing." The instant case is comparable. While Blackston and Zeigler were not caught red-handed, the evidence against them, particularly Blackston, was an embarrassment of riches. Additionally, the evidence at trial and Blackston's own signed statement indicated that Canas' relationship with him was paternal. "It is not unusual under such circumstances for the obviously guilty defendant to try to assume the entire guilt." *Alfonso, supra,* 552 F.2d at 616, *quoting U. S. v. Alejandro, supra,* 527 F.2d at 428. The Court holds that the testimony of Blackston and Zeigler would have been of negligible weight or probative value.

For the foregoing reasons, the Court thinks its prior rulings on severance were proper, and DENIES a new trial on such grounds.

### D. *Failure to Elect*

Prior to trial, Blackston argued that the conspiracy and possession counts against him were lesser-included offenses of the continuing criminal enterprise count, and the Government should elect to proceed under one or the other. Other defendants made similar motions for election on the ground that, by trying Blackston together with them on the underlying offenses, the jury would inevitably consider the whole group as linked together and this would ultimately prejudice them. The Court denied those motions. Blackston now claims his conviction and sentence on the underlying offenses must be vacated; defendants Brantley, Washington and Canas cite the failure of requiring the Government to elect as error necessitating a new trial.

The argument of the defendants tried with Blackston is just a rehash of their argument for severance. The Court thinks that the cautionary instruction given to the jury—that they consider the evidence against an individual defendant only as to that defendant—was adequate to prevent prejudice in this case. The jury's acquittal of two defendants charged in a count with Blackston is evidence of this adequacy. *See U. S. v. Bolts, supra.*

Blackston's argument, however, steers the Court into the Sargasso Sea of double-jeopardy law. While the Court does not find it persuasive, it is important that the Court's actions in this matter are fully explained.

A defendant can be jointly tried on multiple narcotics charges arising from the same act or acts without raising a double-jeopardy question, even if some of the alleged felonies are lesser-included offenses of the others. *See Jeffers v. U. S.,* 432 U.S. 137, 153, 97 S.Ct. 2207, 2217, 53 L.Ed.2d 168 (1977) (plurality); *U. S. v. Holland,* 494 F.Supp. 918, 923 (D.Md.1980). Allowing a single trial in such an instance merely allows the jury to consider whether the evidence proves the commission of the most serious crime charged, or only one of the lesser crimes whose elements comprise part of the ingredients for the more serious offense. But a jury cannot convict and a sentence may not be imposed on the lesser-included offense when there is a conviction and sentence on the offense which includes it. To do so would result in multiple punishment for the same crime, and this is proscribed by the double-jeopardy clause of the fifth amendment. *Brown v. Ohio,* 432

U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); *U. S. v. Chagra,* 653 F.2d 26 (1st Cir. 1981).

The rule to determine whether one offense is a lesser-included offense of another was set forth in *Blockburger v. U. S.,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932):

"[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."

*Id.* at 304, 52 S.Ct. at 182.[5] *See Albernaz v. U. S.,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981).

Following his conviction, Blackston was sentenced to 20 years on the continuing criminal enterprise count, 15 years on each conspiracy count (the two sentences for conspiracy to be served concurrently) and 5 years on the possession count, for a cumulative total of 40 years in prison. In imposing this sentence, the Court was not unmindful of certain Fifth Circuit precedent which indicates that drug conspiracy convictions are lesser-included offenses to conducting a continuing criminal enterprise. *U. S. v. Michel,* 588 F.2d 986, 1001 (5th Cir. 1979); *U. S. v. Johnson,* 575 F.2d 1347, 1354 (5th Cir. 1978); *see also U. S. v. Stricklin,* 591 F.2d 1112 (5th Cir. 1979). However, those cases did not expressly consider the issue; their conclusive result was arrived at in reliance on the Supreme Court plurality in *Jeffers v. U. S., supra.* But this Court reads *Jeffers* to have only *assumed* that a conspiracy to possess drugs is a lesser-included offense of a continuing criminal enterprise in order to reach the central issue

of that case—whether a defendant waives his double-jeopardy claims by electing to have a greater and lesser offense tried separately and persuades the trial court to honor his election. *Id.* 432 U.S. at 149–150, 152 n.20, 97 S.Ct. at 2215–2216, 2217 n.20. The Fifth Circuit itself arrived at a similar interpretation in *U. S. v. Larkin,* 605 F.2d 1360, 1365 (5th Cir. 1979).

What troubled this Court when it sentenced Blackston was the notion that to accept his view of the relationship between § 848 and the drug felonies that underlie that offense would create enforcement problems for prosecutors that Congress did not intend when enacting the continuing criminal enterprise legislation. If a defendant is convicted at a joint trial of a continuing criminal enterprise violation and three or more underlying felony violations, the trial court vacates the convictions on the underlying offenses and, on appeal, the continuing criminal enterprise conviction is vacated, the defendant will then be immunized from retrial on the underlying offenses because jeopardy would no longer continue on them. *U. S. v. Larkin, supra,* 605 F.2d at 1368–1369. The resulting anomaly is made clear by the circumstances of this case. The evidence against Blackston on the conspiracy and possession counts was overwhelming; yet, to grant his motion may result in the Government losing a conviction for narcotics conspiracy and possessory offenses after a constitutionally fair trial on those charges and overwhelming evidence to support them.[6]

This Court thinks that Congress intended to punish the professional criminal severely when it passed § 848, *Jeffers v. U. S.,* 432 U.S. at 156, 97 S.Ct. at 2219, that consistent with the history of narcotics leg-

---

**5.** "[T]he question of what punishments are constitutionally permissible [under the double-jeopardy clause] is not different from the question of what punishment the Legislative Branch intended to be imposed." *Albernaz v. U. S.,* 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981). In applying the *Blockburger* test, a court is merely "determin[ing] whether Congress has ... provided that two statutory offenses may be punished cumula-

tively." *Whalen v. U. S.,* 445 U.S. 684, 691, 100 S.Ct. 1432, 1437–1438, 63 L.Ed.2d 715 (1980).

**6.** A continuing criminal enterprise offense might be reversed because of insufficient evidence to prove that the defendant organized, supervised or managed at least five other persons, an element of proof absent from narcotics conspiracy or possessory offenses but essential to a conviction under § 848. *See U. S. v. Phillips, supra,* 664 F.2d at 1013.

islation in this country the statute "reveals the determination of Congress to turn the screw of the criminal machinery—detection, prosecution, and punishment—tighter and tighter." *Gore v. U. S.,* 357 U.S. 386, 390, 78 S.Ct. 1280, 1283, 2 L.Ed.2d 1405 (1958) (Frankfurter, J.). The Court further thinks that, in passing the continuing criminal enterprise statute, Congress did not intend to allow the "loophole" that would occur if narcotics felonies that may comprise a continuing criminal enterprise offense were held to be lesser-included offenses of that greater crime. The Court, therefore, denied the defendant's motion to vacate in order that the question of the special relationship between 21 U.S.C. § 848 and other felony provisions of the Comprehensive Drug Abuse Prevention & Control Act of 1970, 21 U.S.C. § 801 *et seq.,* be expressly considered and explained by the Eleventh Circuit on appeal. The Court adheres to this course today, and DECLINES to alter its earlier holding.

### E. *Failure to Supply Jencks Act Material*

■ During the week prior to trial, Michael Feltovic, III, originally named in Counts II, III and V of the indictment, pleaded guilty. He was interviewed at that time by various Government agents, and notes were taken at the interview. Feltovic testified against his codefendants at the trial; however, the notes were not made available to the defendants following that testimony. Blackston, Canas, Brantley and Washington argue that this failure violated the provisions of the Jencks Act, 18 U.S.C. § 3500, and warrant a new trial. The Government correctly responds that such information does not fall within the purview of the Jencks Act. "[N]otes taken by an interviewer during an interview with [a] witness do not qualify as a statement under the Jencks Act," *U. S. v. Martino,* 648 F.2d 367, 387 n.9 (5th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1978, 72 L.Ed.2d 445 (1982), and do not have to be produced to the defense following the witness' testimony. *Id.* Preserving them for purpose of review, all notes taken by the Government

regarding Feltovic were sealed and made a part of the record in the case. A new trial on this ground is DENIED.

### F. *Jury Instructions*

■ Defendants Blackston and Canas have also renewed their objections to the Court's failure to give certain jury instructions. Numerous requests are at issue, yet they all pertain to the charge of conspiracy to import (Count II), or the continuing criminal enterprise charge (Count I). The Court has again reviewed the requested charges and determines that they were either delivered in substantially similar form by the Court or incorrectly stated the elements of the offense. Failure to give an instruction, covered adequately elsewhere in a charge, is not reversible error. *U. S. v. Goss,* 650 F.2d 1336, 1348 (5th Cir. 1981); *U. S. v. Jones,* 642 F.2d 909, 915 (5th Cir. 1981). The trial judge is under no duty to give inaccurate instructions. *U. S. v. Jones, supra.*

■ During the oral hearing on the motions, counsel for Blackston and Canas voiced particular concern over the Court's failure to define the term "customs territory of the United States." The Court instructed the jury that § 952(a) of Title 21 proscribed the importation of illegal narcotics destined for the "customs territory of the United States." Defendants' counsel argue that, without the further instruction, the jury might have mistakenly inferred that the defendants' intended destination for a particular haul of marijuana was an area within the customs territory of the United States when, in fact, such an area lies outside the borders of American customs territory. However, the definition of the term was never a vital issue in the case. The Government contended throughout trial that the intended objective of the importation conspirators was the arrival of the marijuana on American soil. The conspirators' defense was that, even where it was proved that a purchase in Colombia had been made, the ultimate destination of the drugs was the Bahamas. *See supra,* p.

1206. There was no serious dispute that either American soil is not part of United States customs territory, or that Bahamian soil is, and no reason to assume that the jury needed any clarification of the matter. The Court concludes that the proposed instruction did not concern an important issue at trial and that the failure to deliver the instruction did not impair the defendants' ability to effectively present their defense. *U. S. v. Grissom,* 645 F.2d 461, 464 (5th Cir. 1981); *Pine v. U. S.,* 135 F.2d 353, 355 (5th Cir.), *cert. denied,* 320 U.S. 740, 64 S.Ct. 40, 88 L.Ed. 439 (1943).

 Aside from his objections on failure to instruct, Blackston also argues that the sequence in which the Court delivered its instructions prejudiced the defendant. Specifically, he contends that the Court gave "undue emphasis" and "prominence" to the continuing criminal enterprise charge by instructing the jury on this offense after having charged them on the other counts. Yet, the sequence was logical; Counts II, III and V comprised underlying offenses to the continuing criminal enterprise count, and a jury finding of guilt on those counts was a necessary step in arriving at a guilty verdict on Count I.[7] The Court does not think that Blackston or Canas was prejudiced by the form or content of the Court's charge, and DENIES a new trial on that ground.

### G. *Legality of the Search and Arrest Aboard the "Lady Lynn"*

On August 21, 1981, Coast Guard officers from the cutter "Steadfast" boarded the shrimp boat "Lady Lynn," an American vessel sailing on the high seas off the coast of Colombia. While on board, the officers found numerous bales of marijuana, resulting in the seizure of the vessel and arrest of its crew, including one William Welch, Jr. Welch later told authorities about the participation in that scheme of David Blackston and other defendants in this case, and this information and further investigation led to the instant indictment. Blackston,

Canas, Brantley and Washington challenged the legality of the seizure and arrest and the introduction of any evidence obtained against them as a result of that seizure. They now argue that the Court's failure to suppress such evidence amounted to error requiring a new trial.

At trial, Lieutenant Junior Grade Randy Brown, the "Steadfast's" officer-of-the-day when the "Lady Lynn" was seized, and Ensign Paul Sanchez, a member of the crew that boarded the "Lady Lynn," presented an uncontroverted account of the circumstances surrounding the seizure of that vessel. On the night of August 21, 1981, the "Steadfast," heading northward from Brazil, spotted light from a vessel approximately six miles away and proceeded toward it. Upon approach, the "Steadfast" twice attempted to make radio contact but was unsuccessful. A searchlight revealed the vessel was a shrimp boat out of the port of Savannah. A boarding party was assembled to check the vessel's documentation and its adherence to safety regulations. As the party boarded the "Lady Lynn," the "Steadfast" relayed to it a radio message it had just received from the Federal Intelligence Service in El Paso, which read that the "Lady Lynn" may contain contraband and should be boarded. Nevertheless, the officers did not search the vessel but first were escorted by "Lady Lynn" crewmember Welch to the pilot house, in order to check the boat's documents. While proceeding through the vessel's living quarters, numerous bales of marijuana were in plain view. A subsequent check of the bales for marijuana was indeed positive, and the "Lady Lynn" was seized and its crew arrested.

 Title 14 U.S.C. § 89(a) gives the Coast Guard plenary authority to stop and board an American vessel on the high seas for a safety and documentation inspection without probable cause. *U. S. v. Clark,* 664 F.2d 1174, 1175 (11th Cir. 1981); *U. S. v. Jonas,* 639 F.2d 200, 202 (5th Cir. 1981); *U. S. v. DeWeese,* 632 F.2d 1267, 1269 (5th

---

7. Proof of guilt of three felony provisions of the Comprehensive Drug Abuse Prevention & Control Act meets § 848's requirement that the kingpin commit a continuing series of violations. *See U. S. v. Phillips, supra,* n. 6.

Cir.), *cert. denied,* 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 188 (1981). The Coast Guard acted legally, therefore, when it boarded the "Lady Lynn." Even if a secondary purpose in boarding was to look for narcotics, this would not taint the legality of the Coast Guard's entry on the ship. *U. S. v. Alonso,* 673 F.2d 334, 336 (11th Cir. 1982) (per curiam); *U. S. v. Clark, supra; U. S. v. Jonas, supra; U. S. v. DeWeese, supra.* The contraband was in plain view of the crew while they attempted the initial documentation check. The seizure of the narcotics and the subsequent arrest of the crew, therefore, fall within the plain-view doctrine. *See U. S. v. Alonso, supra; U. S. v. Clark, supra; U. S. v. Jonas, supra.* The Court acted properly in denying the previous motions to suppress.[8]

### H. *The Admissibility of Rule 404(b) Material*

Defendant Brantley asserts that he was substantially prejudiced by the admission of Rule 404(b) extrinsic evidence during trial, Fed.R.Evid. 404(b), and that, as a result, he was denied a fair trial and a new one should be ordered. The extrinsic evidence at issue concerns his arrest during an aborted marijuana smuggling attempt in February, 1982. On that date, the shrimp boat "Rubber Duck," of which Brantley was the Master, was boarded in international waters by officers of the Coast Guard cutter "Tamaroa" and, during the course of an inspection for documents, a multi-ton cargo of marijuana was discovered.[9] Brantley was subsequently taken aboard the "Tamaroa" and, during an interrogation session at which

Brantley waived his *Miranda* rights, he recounted details of the plan and indicated the routes usually taken by marijuana smugglers, the amounts he and his crew were to be paid and how he and his crew usually spent the money earned from such activity. Both the events concerning the seizure and Brantley's statements were introduced at trial.

The thrust of Brantley's argument is that the admission of this evidence violated the precepts of *U. S. v. Beechum,* 582 F.2d 898 (5th Cir. 1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). This Court disagrees.

In *U. S. v. Beechum, supra,* the Fifth Circuit delineated a two-part test to determine the admissibility of extrinsic offense evidence. First, the extrinsic evidence must be relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice. *Id.* at 911. The test is designed to eliminate the possibility that a defendant will be convicted of an offense, not because of his guilt, but because the jury either thinks he has a bad character or because it wishes to punish him for the extrinsic offense. *Id.* at 910.

 Both requirements of the *Beechum* test were satisfied in this case. Evidence of Brantley's subsequent involvement with importation of large quantities of marijuana is highly probative of his knowing possession of large quantities of marijuana on previous occasions and his intent to distribute those drugs.[10] The bribe offer, *see*

---

**8.** In the alternative, the Court holds that the defendants who seek a new trial on this ground had no fourth amendment interest in the "Lady Lynn" and, therefore, lacked standing to challenge the propriety of that seizure. *Cf. U. S. v. Alonso, supra.*

**9.** Brantley also contends that the search of the "Rubber Duck" was illegal and any evidence of an offense obtained as a result of the search was inadmissible. However, as explained in the discussion of the "Lady Lynn" search, *supra,* p. 1211, the Coast Guard is free to stop and board any boat for a documentation check without probable cause. *See U. S. v. Clark,*

*supra.* Lieutenant Junior Grade Joseph Sikora, who commanded the party that boarded the "Rubber Duck," testified that, prior to any search of the vessel, Brantley admitted that the ship was carrying marijuana and offered Sikora a bribe to let the ship proceed. This established probable cause for a subsequent search of the hold, which revealed the marijuana.

**10.** It should be noted that, simply because the extrinsic offense occurred subsequent to the offense tried *sub judice,* such evidence is not *per se* inadmissible, *U. S. v. Pollard,* 509 F.2d 601, 604 (5th Cir.), *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975), and the

*supra,* n.9, is relevant to the question of knowledge, intent and identity; because the size of the bribe—over $50,000—indicates that Brantley was not simply a fisherman on a one-time smuggling venture but was substantially involved in narcotics trafficking, an involvement that could easily involve narcotics violations in early 1981. Even Brantley's statements about facets of the drug business, although quite narrow in scope, raise an inference of involvement in previous schemes.

 Furthermore, the Court does not think the probative value of the evidence was substantially outweighed by its undue prejudice. The time differential between the two offenses was only one year, a gap not so lengthy that the inferences from the extrinsic offense would lose their probative force. *See U. S. v. McMahon,* 592 F.2d 871, 876 n.6 (5th Cir. 1979) (three-year differential between prior extrinsic offense and offense charged does not diminish probative value of prior offense); *see also U. S. v. Albert,* 595 F.2d 283, 288–289 (5th Cir. 1979). Nor were Brantley's statements or the extrinsic offense of a nature so heinous as likely to incite a jury to an irrational decision. *U. S. v. Mitchell,* 666 F.2d 1385, 1390 (11th Cir. 1982). Most importantly, the Court gave a detailed limiting instruction to the jury following the admission of such evidence, and the courts have uniformly acknowledged that a detailed instruction, as to how similar-act evidence may be weighed, substantially reduces the likely prejudice resulting from receipt of such evidence. *See, e.g., U. S. v. Guerrero,* 650 F.2d 728, 735 (5th Cir. 1981); *U. S. v. Black,* 595 F.2d 1116, 1118 (5th Cir. 1979) (per curiam); *U. S. v. McMahon, supra,* 592 F.2d at 876; *U. S. v. Beechum, supra,* 582 F.2d at 917 n.23. The Court DENIES this portion of Brantley's motions.

Additionally, defendants Canas and Washington renew their separate objections to the receipt of such evidence as to Brantley. Again, the arguments are related to the question of severance; they contend that the spill-over effect of the similar-acts evidence against Brantley created compelling prejudice against them and denied them a fair trial.

 The existence of prejudice depends upon the facts of each case, and the test to determine prejudice is whether the jury can keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to each. *Tillman v. U. S.,* 406 F.2d 930, 935 (5th Cir.), *vacated in part on other grounds,* 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969). In the instant case, none of the extrinsic evidence against Brantley implicated Canas or Washington in any way. Also, the Court gave no less than three limiting instructions to the jury on how that evidence should be considered as to other defendants—both immediately before and after its receipt and during the charge. In *U. S. v. Davis,* 546 F.2d 617 (5th Cir. 1977), the Circuit Court ruled that cautious and careful instructions to a jury not to consider the evidence of extrinsic misconduct of one defendant, when considering the evidence of guilt of his codefendants, was a primary consideration in determining whether prejudice resulted from a joint trial. This Court's careful and timely instructions and the jury's subsequent acquittal of two defendants, one of whom was charged in the same count as Brantley, indicate that there was no compelling prejudice from the jury's consideration of similar-acts evidence against Brantley. The Court DENIES this portion of Canas' and Washington's motions.

I. *Admission of Statement of Frank Senior*

Defendant Canas renews his objection to the admission of a signed, written statement by Government witness Frank Senior, III. Senior was named in Count II of the indictment (conspiracy to import narcotics). The statement was prepared by him and his lawyers several days after his arrest in New York, presumably in the hope that it would gain him a more attractive plea agreement with the Government and a less severe prison term from the sentencing judge.

*Beechum* test is still applicable. *Beechum, su-* *pra,* 582 F.2d at 903 n.1.

Canas argues that the statement was inadmissible hearsay and, if not, its presence in the jury room nevertheless prejudiced him because it provided a written condensation of the Government's case. However, the statement was properly admissible as a prior consistent statement under Fed.R.Evid. 801(d)(1)(B). During direct examination, Senior testified he was told by coconspirators that the destination of the marijuana smuggled aboard the "Miss Mary," and the "Lady Lynn" in November, 1980, was the United States. *See supra,* p. 1206. During cross-examination, Senior was asked to look at his statement, which he had indicated was "full" and "complete," and note where it told how he knew the final destination of the "Miss Mary" and "Lady Lynn" cargoes. Senior conceded that the statement was silent on that subject. On the contrary, however, the statement, on p. 14, did allude to the final destination of the cargoes. The Government, therefore, subsequently sought admission of the statement, in order to show that Senior, in giving it a quick perusal on the witness stand, had overlooked part of its contents and that his earlier testimony was, in fact, consistent with his prior statements. This presented a proper purpose for admission. *See U. S. v. Mock,* 640 F.2d 629, 632 (5th Cir. 1981); *U. S. v. Albert, supra,* 595 F.2d at 289; *U. S. v. Williams,* 573 F.2d 284, 289 (5th Cir. 1978).

Although the statement was lengthy, the Court does not think that its complete submission into evidence prejudiced Canas' defense because his counsel conducted an exhaustive cross-examination of Senior on the very statements included in the document, as did counsel for Zeigler and Blackston. The Court DECLINES to order a new trial for Canas on the basis of the jury's receipt of this document.

## J. Jury Improprieties

Lastly, defendants Blackston, Canas, Zeigler, Brantley and Washington challenge the propriety of the jury verdict. They allege that the verdict was a product of misconduct toward the jury by third parties and misconduct by members of the jury itself. They argue that such misconduct is sufficient to overturn the verdict and necessitates a new trial.

### 1. The Procedural History

A review of the procedural history of these allegations reveals four specific charges of misconduct:

(a) during lunch recess on the third day of the trial, Deputy U. S. Marshal Dave Waldron questioned juror Barbara Miller about a spectator in the courtroom with whom she was having eye contact, and inquired as to the interests that spectator may have had for viewing the trial;

(b) during deliberations about defendant James Murray, juror Angela Blige informed other members of the jury that she knew Murray's daughter and that Murray's daughter had previously told her that Murray was involved in drug smuggling;

(c) during the final day of deliberations the jury foreperson ordered juror Barbara Miller to deliberate by herself in a small room adjoining the main jury room; and

(d) as the jury was retiring to their motel following the first full day of deliberations, at least one Deputy U. S. Marshal voiced his displeasure that a verdict had not yet been reached.[11]

Two *in camera* hearings were conducted by the Court to test the accuracy of these

11. The allegations of jury improprieties first reached the Court's attention in a motion by counsel for defendant Canas to interview jurors. The motion was supported with an affidavit from one Leroy Anderson, the boyfriend of juror Barbara Miller. He claimed that Miller had been distraught when she visited him following the release of the jury. He then recounted various incidents at trial which Miller had indicated to him had disturbed her. The account provided the basis for the first three charges of misconduct noted above. The final charge of misconduct was brought to the Court's attention by juror Miller herself when questioned by counsel for defendants at the Court's first *in camera* hearing on the prior charges. *See infra.*

allegations. On June 4, 1982, Barbara Miller, Leroy Anderson, Deputy U. S. Marshal Dave Waldron, Administrative Assistant with the U. S. Marshal's office Joanne Dickens and U. S. Marshal Clifton Nettles were called before the Court and questioned under oath by counsel for the Government and defendants. Deputy Marshal Waldron testified that during the trial he acted as courtroom deputy for the Marshal's Service and was responsible for maintaining courtroom security. He also assisted in transporting the jury to and from breakfast and lunch and watching them during those meals. Waldron testified that, during the morning of approximately the third day of trial, he noticed one of the courtroom spectators making persistent eye contact with one of the jurors. He knew the spectator to be one Leroy Anderson. Waldron indicated that he knew Anderson by sight because he was a personal friend of Anderson's father. He also testified that he knew that Anderson, a resident of the Richmond Hill, Georgia, area, was friendly with certain Richmond Hill residents previously tried in federal court on narcotics charges and, specifically, that Anderson had sat through three earlier narcotics smuggling trials of Richmond Hill resident Barry Spence. Describing Anderson's contact with the juror, Waldron said:

"[i]t became evident that one of the female jurors knew Mr. Anderson and was in concert with his eye to eye contact, or smiled at him, and nodded back. And occasionally things would be said in the course of examining a witness where Mr. Anderson would nod his head and smile and she looked at him. Whether that was her personal business or whether he was trying to signal her, I don't know."[12]

This testimony was supported by the testimony of U. S. Marshal Clifton Nettles, who was in the courtroom that morning and "notice[d] that a particular juror and a spectator were exchanging glances and a smile."[13] From the jury chart available to

Waldron, he learned that the particular juror involved was Barbara Miller. That afternoon, while the jury was at a local restaurant having lunch, Waldron questioned Miller about the contact. Waldron testified that he was standing by a wall which divided the public dining room from the private dining room where the jury sat, and he caught Miller's attention as she returned from the restroom with two other jurors and the jury matron. Waldron then testified as follows:

And I remarked to her, "I saw that Big Anderson boy in the courtroom this morning and I saw what his interests was [sic]." And, she said, "Yes, sir, that's my boyfriend and he's keeping my children." I said, "Well I knew him when he was a young boy, and I knew his father quite well." And, I can't recall if I said anything about knowing his father when I was a State Trooper or anything for sure about that part. I made no mention of any other knowledge.[14]

Waldron's account of the site of the conversation, and its brevity, were supported by the testimony of Joanne Dickens who, as jury matron, accompanied Miller from the restroom when Waldron spoke with her. While indicating that she did not hear the conversation, she did say that she could see the two conversing and thought "it was just a matter of seconds, maybe ten seconds."[15] Dickens also testified that no other juror could have heard the conversation, because they were too far from where it took place and faced in the opposite direction.

Juror Miller presented a different account of the conversation. She claimed that the conversation occurred during breakfast on the fourth day of the trial. She testified:

[O]n the way back [from the restroom], there was a sliding door that they would partition us off with in this room. And, as we walked through it, the Marshal kind of called me to the side and into the

12. Hearing transcript, p. 106 (June 4, 1982).

13. Hearing transcript, p. 144 (June 4, 1982).

14. Hearing transcript, p. 109 (June 4, 1982).

15. Hearing transcript, p. 147 (June 4, 1982).

other room, not the room that we were eating in, but on the other side of the partition.... And he said something to the effect and I'll try to remember to the best of my ability exactly what he said. He said "I noticed that Big Anderson was in the court room yesterday." And, I said, "You mean Roy Anderson?" And, he said, "Yes." And, he explained to me how he knew Roy, that he had known his father in the past and he used to be in Richmond Hill and he knew Roy and his friends as they were growing up. And, that he noticed that Roy had followed the Barry Spence trial very closely. That he had been there every day when Barry was being tried. And, that he realized that Roy and Barry were friends because they went to school together and grew up together.

And, then he said something to the effect that he was glad to know that Roy's interests in this case was [sic] not that of any of the defendants being tried.

So, then I asked him, "Well, exactly what do you think his interest is?" And, he said, well, you know, don't y'all date each other. And, I said, "Well, yes, we do. As a matter of fact, he is keeping my children for me while I'm serving as a juror." And, then, you know, that was about all that was said.[16]

Juror Miller also testified that this conversation "preyed heavily" upon her during the final day of deliberations, when she found herself the only juror reluctant to convict defendant Blackston. Her testimony on this point was obtuse, but she indicated that the conversation did "in some way" influence her to vote guilty for Blackston.[17]

Miller also recalled being surprised at comments that two other Marshals made during the course of deliberations. She in-

dicated that, at 9:00 p. m. on the Saturday evening before the verdict was reached, a "dark-haired" Marshal inquired as to whether a verdict was reached and, upon being told one had not, he "abruptly" ordered them to prepare to retire to the motel. Miller further testified that, upon reaching the motel, a second Marshal commented to the jury something to the effect that "we thought we would be able to go home tonight, you know."[18]

Miller was not questioned about any other pressures that may have been exerted upon her in the jury room or any of the other allegations.

On July 8, 1982, a second in camera hearing was held. At this hearing, juror Angela Blige was questioned under oath as to any remarks she may have made during deliberations about her prior knowledge of defendant Murray. The inquiry was conducted by the Court, with counsel for both sides able to submit suggested questions. Blige admitted that she knew Murray's daughter, but she explicitly denied that Murray's daughter had ever mentioned to her anything about Murray. She also explicitly denied ever having known Murray, that she told the jury anything about Murray heard outside the courtroom or even that she told the jury she knew Murray's daughter.

The Court also questioned all members of the U. S. Marshal's office in Savannah pertaining to the alleged comments made to jurors after they had concluded their deliberations for Saturday, April 26. The questioning revealed that three Marshals fitting juror Miller's description were with the jury in the courtroom during the period in question—Marshal Nettles and Deputy Marshals George Sterling and Glenn Tucker. None of the men recalled whether it was he who suspended jury deliberations for the evening. Testimony further revealed that

16. Hearing transcript, pp. 10–11 (June 4, 1982).

17. Hearing transcript, p. 30 (June 4, 1982). In particular, Miller testified:
I was the only one that said he was innocent and I reflected back, you know, on everything that happened that week. And, I said, you know, that shook me up anyway, what

the Marshal had said.... And, I wondered, you know, if I am out here, and I say he's guilty, what if they [the jury] question me, you know, why do you feel that way. And, it just, you know, it entered my mind what the Marshal had said to me....

18. Hearing transcript, p. 48 (June 4, 1982).

three personnel from the Marshal's office were with the jury when it arrived at the hotel that evening—Don King, Richard Hall and Glenda Thorton. All three explicitly denied voicing any displeasure as to the status of the jury's deliberations.

## II. LEGAL ANALYSIS

Three tasks now remain with the Court. First, it must review the procedures it conducted to test the allegations and determine if the procedures were sufficient under the law. Second, if the scope and method of inquiry were proper, the Court must make findings as to what the hearings revealed. Finally, the Court must draw legal conclusions from those findings.

The cornerstone of our criminal justice system is the jury. The jury determines how a defendant actually conducted himself in a prior situation and whether such conduct should be impressed with the imprimatur of legality or the stamp of illegality. Yet, the theory of our system is that the conclusions the jury reaches "in a case will be induced only by evidence and argument in open court and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907) (Holmes, J.); *see also Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Extrinsic influences upon a jury may violate various protections guaranteed by the sixth amendment—a defendant's right to confront witnesses, his right to assistance of counsel and, of course, his right to an impartial jury. When those extrinsic influences are directed from an officer of the Court, another duty owed to a criminal defendant is impugned—"the duty of the court 'to protect the integrity of its own processes.'" *Govt. of the Virgin Islands v. Gereau,* 523 F.2d 140, 151 (3d Cir. 1975), *quoting U. S. v. McKinney,* 429 F.2d 1019, 1032–1033 (5th Cir. 1970) (Godbold, J., dissenting), *cert. denied,* 401 U.S. 922, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971).

Accordingly, the popular legal axiom that "a juror may not impeach his own verdict" states too much. Since the 19th Century, the established rule regarding a juror's competence to attack a verdict is that "a juryman may testify to any facts bearing upon the question of the existence of any *extraneous influence,* although not as to how far that influence operated upon his mind." *Mattox v. U. S.,* 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917, *quoting Woodward v. Leavitt,* 107 Mass. 453 (emphasis added); *see* Fed.R.Evid. 606(b). The rule represents a compromise. It enables the Court to test for possible constitutional violations when a juror or jurors (a) are exposed to news items about the trial; (b) consider extra-record facts; (c) communicate with third parties about the case; or (d) are pressured in some way by the court. *Govt. of the Virgin Islands v. Gereau, supra.* Yet, it also accords deference to those important policy considerations which commend an inviolate jury process—(a) the protection of jurors against annoyance and harassment by losing parties; (b) the encouragement of free and open discussion among jurors; (c) the reduction of incentives for jury tampering; and (d) the promotion of finality in a jury's verdict. *McDonald v. Pless,* 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915); *Govt. of the Virgin Islands v. Gereau, supra,* 523 F.2d at 148; *U. S. v. Crosby,* 294 F.2d 928, 950 (2d Cir. 1961); *Advisory Committee Notes,* Fed. R.Evid. 606(b). The rule represents, in Judge Henry Friendly's words, "a pragmatic judgment how best to attempt reconciliation of the irreconcilable." *Miller v. U. S.,* 403 F.2d 77, 83 n.11 (2d Cir. 1968).

Intrinsic influences upon a jury's verdict, therefore, are not grounds upon which to overturn a verdict, and a juror is not competent to testify about such matters. *U. S. v. Bassler,* 651 F.2d 600, 602 (8th Cir. 1981); *Govt. of the Virgin Islands v. Gereau, supra,* 523 F.2d at 148–149; *U. S. v. Howard,* 506 F.2d 865, 866–867 (5th Cir. 1975). Intrinsic influences include "discussions among jurors, intimidation or harassment of one juror by another, and other

intra-jury influences on the verdict."[19] *Gereau, supra,* 523 F.2d at 149–150. Accordingly, no further discussion need be given to the third charge of impropriety in this case—juror Miller's isolated deliberation forced by other jurors. This charge is within the sphere of intra-jury influences, and the Court was correct in refusing to take any testimony on the subject.

The case law in the Fifth Circuit is clear on the procedures a trial court should follow when an allegation of extrinsic influence is made. When a court receives a colorable claim of outside influences upon a jury, one supported by affidavit or other sworn statement, the trial court should hold a hearing to investigate the accuracy of those allegations. *U. S. v. Sedigh,* 658 F.2d 1010, 1013–1014 (5th Cir. 1981);[20] *U. S. v. Howard, supra,* 506 F.2d at 869. Yet, the appropriate procedure to be used at the hearing is left to the discretion of the trial judge. *U. S. v. Sedigh, supra,* 658 F.2d at 1013; *U. S. v. Reyes,* 645 F.2d 285, 288 (5th Cir. 1981); *U. S. v. Buchanan,* 633 F.2d 423, 427 (5th Cir. 1980); *U. S. v. Martinez,* 604 F.2d 361, 364 (5th Cir. 1979). "The judge may well find it better that he control any questioning . . . by passing in advance on the questions sought to be propounded." *Miller v. U. S., supra,* 403 F.2d at 82. Moreover, the trial judge may find it unnecessary to conduct a full jury investigation to ensure that the alleged extrinsic influence did not, in fact, occur. *U. S. v. Sedigh, supra,* is instructive on this point. In *Sedigh,* the wife of the defendant alleged that a Deputy U. S. Marshal told two jurors of the defendant's prior conviction for a conspiracy offense, a fact that did not come out at trial. The trial court held an *in camera* hearing during which it questioned, under oath, the two Deputy Marshals who were in charge of the jury and the wife of the defendant. The wife merely repeated her charge and the Deputy Marshals flatly denied it. The Court of Appeals held that, since the allegations remained speculative after questioning the possible wrongdoers, the trial court acted properly in not proceeding further and in concluding that a jury breach had not been proved.[21]

In the instant case, the Court made direct inquiries of those individuals alleged to have violated the sanctity of the jury. After questioning juror Blige and the Deputy Marshals who may have spoken out of turn to the jury on the evening of April 25, the allegations of possible malfeasance on their part remains speculative, at best. Applying the case law, the Court concludes that it acted properly in declining to conduct any further investigation of the charges against them. It further concludes that the defendants have not adequately proved their second and fourth allegations.

It is clear, however, that there was communication between an officer of the Court and a juror related to events occurring in the courtroom during the trial. Yet, a third-party communication with a juror is not grounds *per se* for setting aside a verdict. *Govt. of the Virgin Islands v. Gereau, supra,* 523 F.2d at 153–154. The Court

**19.** It should be noted that extrinsic facts or opinions that enter the jury room through the lips of another juror are still considered extrinsic influences, and the jury's receipt of such "evidence" is a ground to overturn the verdict and the speaker is competent to testify to such matters. *U. S. v. Howard,* 506 F.2d 865, 867 (5th Cir. 1975). In the instant case, if juror Blige had told the jury about Murray's daughter's thoughts concerning her father's illicit activities, she would have introduced to the jury a non-juror's opinion about the case, which was not subject to cross-examination.

**20.** Although the *Sedigh* decision was handed down after September 30, 1981, and is not, therefore, binding precedent on this Court, *Bonner v. City of Prichard, Ala., supra,* this Court will treat the decision and all recent decisions of the newly constituted Fifth Circuit as highly persuasive authority. This consideration proceeds from the fact that recent Fifth Circuit decisions will inevitably rely upon and interpret *older* Fifth Circuit cases, which *are* binding on this Court. *See Bonner v. City of Prichard, Ala., supra.*

**21.** The defendant has the burden of proving the existence of a jury breach by a preponderance of credible evidence. *U. S. v. Winkle,* 587 F.2d 705, 717 (5th Cir.), *cert. denied,* 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979); *U. S. v. Wayman,* 510 F.2d 1020 (5th Cir. 1975).

must further determine the prejudicial effect of the communication. *Id.* Unfortunately, the courts have been inconsistent in deciding the approach to take to determine prejudicial effect.

The starting point for analysis is the rule of competency established in *Mattox v. U. S., supra.* Since *Mattox* forbids testimony by a juror "as to how far [an extrinsic influence] operated upon [the juror's] mind," the rule would appear to suggest that prejudicial effect cannot be determined by resort to subjective evidence—the *actual* effect of the communication on the juror should not be ascertained. This reasoning was applied by the Fifth Circuit in *U. S. v. Howard, supra.* The *Howard* court held that, once the district court determines the precise quality of the jury breach, it must "then determine whether there was a reasonable possibility that the breach was prejudicial to the defendant." 506 F.2d at 869. In so doing, the trial court "is precluded from investigating the subjective effects of any breach on any jurors." *Id.* The court "*must reach a judgment concerning the subjective effects of objective facts* without the benefit of couch-interview introspections." *Id.* The burden was placed on the Government to demonstrate the harmlessness of the breach.

However, in *U. S. v. Winkle, supra,* the Fifth Circuit appeared to outrun the earlier proscription in *Howard.* Although the *Winkle* court adopted the "reasonable possibility of prejudice" test of *Howard,* it also held that, once a breach is shown, the burden is on the Government to demonstrate "that the influence in question was not, *in fact,* prejudicial." 587 F.2d at 714 (emphasis added). This language suggests not an approximately arrived at conclusion by reference to objective facts but, rather, a judgment by inquiry into the juror's personal opinion. In *Winkle,* the Fifth Circuit evaluated the prejudice to a defendant of the jury's extra-court knowledge that his codefendant in conspiracy pleaded guilty prior to trial. Winkle had been charged with one count of conspiracy to defraud the United States and 19 substantive counts. The jury found him guilty only on the substantive counts. While the *Howard* objective approach would suggest a finding based on the assumption that the guilty plea was relevant only in relation to a charge in which Winkle was found not guilty, the *Winkle* court went further and *relied* on the testimony of the jury foreman that the jury did not, *in fact,* discuss the plea in relation to the substantive counts but only the conspiracy count. *Id.* at 714–715.

Inconsistent signals can also be noted in Supreme Court opinions. In both *Parker v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) (per curiam), and *Remmer v. U. S.,* 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956), there is *dicta* to the effect that an evaluation of actual effect on a juror of communication with a third party is permissible. However, both opinions were primarily concerned with the *inherent* effects of *particular* third-party communications—in *Remmer,* a juror's successive encounters with possible bribe offers and an intrusive F. B. I. investigation during the trial and, in *Parker,* a bailiff's statement to a juror that he thought the defendant was a "wicked" fellow who was "guilty." *See also U. S. v. Brumbaugh,* 471 F.2d 1128, 1129 (6th Cir.), *cert. denied,* 412 U.S. 918, 93 S.Ct. 2732, 37 L.Ed.2d 144 (1973); *Port Terminal & Warehousing Co. v. John S. James Co.,* 92 F.R.D. 100, 109 (S.D.Ga.1981) (Edenfield, J.) (*Howard* does not forbid reliance on testimony that a "juror was not influenced at all.").

But this Court firmly believes that a strict reading of *Howard* is the proper course in evaluating the prejudicial effect of any extrinsic influence upon a jury. To hold otherwise would invest a juror, later dissatisfied with a verdict, a vast power to destroy the verdict's finality. The problem with giving weight to a juror's opinion on the effect of an outside influence is that the opinion rests in his own personal consciousness and cannot be tested by other testimony—only he knows for sure whether the expressed opinion is the truth. Such deference, therefore, "give[s] to the secret thought of one the power to disturb the expressed conclusions of twelve; its tenden-

cy is to produce bad faith on the part of a minority, to induce an apparent acquiescence with the purpose of subsequent dissent." *Perry v. Bailey,* 12 Kan. 539, 545 (1874) (Mr. Justice Brewer). *Any* innocuous comment made to a juror by a bailiff, Marshal or spectator could later become a basis for reversal, regardless of the motivation of the impeaching juror.

■ Moreover, one should not overestimate the harshness of the *Mattox* rule as followed in *Howard.* The same rule is applied whenever a witness or attorney utters something in the courtroom that is not to be considered by the jury; *i.e.,* extrinsic matters heard in the courtroom. As Judge Smith astutely observed in *U. S. v. Crosby,* 294 F.2d 928, 950 (2d Cir. 1961); *cert. denied sub nom., Mittelman v. U. S.,* 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523 (1962):

> Whenever information erroneously reaches the ears of the jury in open court, the judge's instruction to disregard it may be disobeyed; yet it is not suggested that in such a case the jury ought to be polled as to whether any of them relied on the forbidden knowledge. Even though presumably the jurors themselves know best, the question is determined, as is the question whether an error was prejudicial, on the basis of the nature of the matter and its probable effect on a hypothetical average juror.

Whether the extrinsic evidence reaches the jury's ears in or out of the courtroom, the mode to test prejudice emanating therefrom should be the same. Additionally, a juror who truly believes that the verdict as arrived at in the jury room was unfairly reached is not without remedy. Under Rule 31(d) of the Federal Rules of Criminal Procedure, the jury "shall be polled at the request of any party or upon the court's own motion." A jury poll gives the juror "the right to dissent from the verdict to which he has agreed in the jury room," and, if he does so, the court should either return the jury to their room for further deliberation or discharge them. *U. S. v. Sexton,* 456 F.2d 961, 966 (5th Cir. 1972), *quoting Bruce v. Chestnut Farms-Chevy Chase*

*Dairy,* 126 F.2d 224, 225 (D.C.Cir.1942); *accord Sincox v. U. S.,* 571 F.2d 876, 878 (5th Cir. 1978). In the instant case, each juror was polled as to whether the verdict as read was his and whether it was freely and voluntarily made. Each juror answered affirmatively. To allow a juror to later overturn a verdict by testimony as to the coercion he felt in agreeing to it, by whatever source, would render Rule 31(d) a nullity. The Court, therefore, will make its decision on reversal by determining the reasonable possibility of prejudice to the defendant from Marshal Waldron's comments, assessing from objective factors the likelihood that the influence would affect the average juror. Whatever testimony juror Miller might have provided as to the prejudicial effect of the conversation is of no consequence to this Court. *Accord U. S. v. Bassler, supra; U. S. v. Williams,* 613 F.2d 573 (5th Cir. 1980); *Llewellyn v. Stynchcombe,* 609 F.2d 194 (5th Cir. 1980); *U. S. v. Vasquez,* 597 F.2d 192 (9th Cir. 1979); *U. S. ex rel. Owen v. McMann,* 435 F.2d 813 (2d Cir. 1970); *State v. Kociolek,* 20 N.J. 92, 118 A.2d 812 (1955) (Brennan, J.) (now Mr. Justice Brennan).

■ Applying this test, the Court concludes that there was no reasonable possibility of prejudice to the defendant from Marshal Waldron's comments. Unlike the bailiff in *Parker v. Gladden, supra,* Marshal Waldron did not indicate his view of the case. Nor did his remarks relate to the evidence or introduce any extra-record facts. Moreover, the conversation lasted for a matter of seconds and was not apparently overheard by anyone. The evidence shows that the conversation was merely an aside as Miller returned from the restroom—she was not interrupted from her meal or ordered away from the jury for questioning. Even assuming that Miller's lengthier account of the conversation is true, all Waldron expressed was his awareness of Anderson's presence in the courtroom, his close friendship with Anderson's father and, because of that friendship, his relief that Anderson was in the courtroom because of his relationship with Miller and not out of an acquaintance with the defend-

ants. There was nothing in Waldron's statements to suggest that either Anderson or Miller was under suspicion by the Marshals for anything—quite the contrary, Waldron clearly indicated that his interest in Anderson derived from his long friendship with Anderson's father and not from a law enforcement interest. Even if Waldron's intent was to infer that he was aware that Anderson and Miller were having eye contact and to refrain from it, neither the content nor the time and location of Waldron's remarks could be said to be threatening or coercive. The Court finds that an average juror would not have come away from the conversation with the impression that she would have to perform her duties with law enforcement personnel "looking over [her] shoulder." *Remmer v. U. S.,* 347 U.S. at 229, 74 S.Ct. at 451.

The possibility of prejudice becomes even more remote, in light of the overwhelming evidence against Blackston and the other defendants. *See U. S. v. Winkle, supra,* 587 F.2d at 715 (trial court should consider overall evidence against defendants in determining prejudice of extrinsic influence).

It is clear that Marshal Waldron's statements were improper.[22] But, on this record, there was no reasonable possibility of prejudice to the defendants resulting from the impropriety. The defendants' motions for a new trial on this ground are DENIED.

## III. CONCLUSION

In conclusion, for the reasons stated above, all of the defendants' motions for a new trial or for a judgment of acquittal are DENIED.

---

22. *See* U. S. Marshal's Directive, USM 4730.1 (June 28, 1977) (all Marshal's office personnel should refrain from conversing with a juror regarding anything related to trial).