**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Asnaldo SANCHEZ, a/k/a Hernando, Jesus Gonzalez, Defendants-Appellants.**

No. 81–5708.

United States Court of Appeals,
Eleventh Circuit.

Jan. 16, 1984.

Rehearing Denied Feb. 23, 1984.

Carl L. Masztal, Miami, Fla., for Sanchez.

**1504**

Sheryl Joyce Lowenthal, Miami, Fla., for Gonzalez.

Caroline Heck, Asst. U.S. Atty., Jon A. May, U.S. Atty., Miami, Fla., for plaintiff-appellee.

Before FAY and KRAVITCH, Circuit Judges, and ATKINS,[*] District Judge.

KRAVITCH, Circuit Judge:

The appellants, Asnaldo Sanchez and Jesus Gonzalez, were tried and convicted by a jury of conspiracy to import cocaine in violation of 21 U.S.C. §§ 952(a) and 963, and of attempt to import cocaine in violation of 21 U.S.C. §§ 952(a) and 963 and 18 U.S.C. § 2. Gonzalez was also found guilty on two counts of importation of cocaine, 21 U.S.C. § 952(a) and 18 U.S.C. § 2, and two counts of possession of cocaine with intent to distribute, 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

## I. BACKGROUND

The appellants' convictions arose out of an extensive Drug Enforcement Agency (DEA) undercover operation known as Operation Grouper investigating the drug trade in the Bahamas and South Florida. Two of the agents involved in Operation Grouper, Thomas Weed and Peter Sarron, were the primary witnesses for the government at trial. They testified to three different occasions when the appellants had acted to bring cocaine into the United States.

Agent Weed testified that he and a confidential informant, Thomas Mallis, had met on the night of July 26, 1979 with Gonzalez and Emilio Carreras[1] and that they had proceeded to a hotel where they met with two Colombians, Carlos Zaccour and a man identified as Hernando. Zaccour gave Weed two suitcases with fake compartments that he said contained five kilograms of cocaine. The group returned to Gonzalez's boat, a yellow, twenty-four foot For-

mula, and the packets, after some difficulty, were placed in secret compartments in the boat's deck. The compartments were then treated by Gonzalez with fiberglass and painted over to match the deck's color. Early the next morning, Gonzalez and Carreras departed for the United States with the packets secreted aboard the boat. Gonzalez had told Weed that he was to receive $5,000 per kilogram for smuggling the cocaine.

Although Weed alerted Customs Officials in Florida, the shipment was never intercepted. On August 8, 1979, however, Weed visited Gonzalez at his home in Miami and asked him if they had succeeded in smuggling the cocaine. Gonzalez replied that they had gotten the cocaine in, but that he had made only $10,000. Gonzalez also told Weed that the cocaine was for a friend of Sanchez's named Rafael.

Weed further testified that on August 16, 1979, he ran into Sanchez at a convenience store in Miami and that he had asked him if they had succeeded in smuggling the cocaine. Sanchez replied that they had been successful, but that he had personally not made any money. Upon being asked by Weed whether he appreciated Weed's help, Sanchez replied affirmatively.

The second incident took place on September 29, 1979, when a Customs aircraft followed the yellow Formula from the Bahamas to Miami. Upon docking, the boat was seized on the pretext that it had not cleared Customs. The boat's two occupants were Gonzalez and Carreras. The vessel was then taken to the Customs House where 1.64 kilograms of cocaine were discovered in the secret compartments. A sham cocaine substance was substituted, and the boat was returned to Gonzalez after he paid a $1500 fine.

Agent Sarron testified that six days later, on October 5, 1979, he and Mallis met with Sanchez at Sanchez's home and that Sanchez told him that he wanted his help in

---

[*] Honorable C. Clyde Atkins, U.S. District Court Judge for the Southern District of Florida, sitting by designation.

1. Carreras was convicted of the same charges as Gonzalez. He is not appealing his conviction.

bringing in two suitcases of cocaine from the Bahamas. Sanchez also told Sarron of Gonzalez's experience with the boat being seized and stated that, although no one had been arrested, the cocaine had been no good and had to be discarded. That same evening Sarron met with Gonzalez and was again told about the boat being seized and the cocaine turning out to be bad. Gonzalez also solicited Sarron's help in bringing in another shipment of cocaine.

The final episode took place on October 7, 1979. United States Customs Agents, maintaining surveillance for the yellow Formula, spotted it arriving at the marina shortly after sunrise. Gonzalez and Carreras were stopped as they were about to tow the boat out of the marina, and the boat, along with the truck and trailer, was again seized. A search of the boat led to the discovery of over four kilograms of cocaine hidden in the boat's deck compartments. When Gonzalez returned to claim the boat two days later, he was read his rights by a Customs Officer and informed that cocaine had been discovered aboard the boat. Gonzalez disclaimed any knowledge of the cocaine and also denied knowing how to use fiberglass or having had any work done on the boat within the last thirty days. He was then released, but the boat was kept by Customs.

On December 6, 1979, Sanchez told Weed and Sarron that Gonzalez's boat had been seized but that Gonzalez had not been arrested. At a later meeting, on September 4, 1980, Sanchez again informed Weed that Gonzalez had lost his truck, trailer, and boat, but that Gonzalez was lucky to not have been arrested.

Sanchez, Gonzalez, and Carreras all testified at trial, each denying any involvement in a conspiracy to import cocaine. They admitted that they knew Agents Weed and Sarron, but only as friends and did not know of their involvement in the drug trade. Sanchez also claimed he was in New York on business on August 16, 1979, the date on which Weed stated he had met Sanchez at the convenience store.

Both Sanchez and Gonzalez challenge their convictions on several grounds: that there was insufficient evidence to support their convictions, that the court improperly admitted coconspirator hearsay statements into evidence, and that they were denied a fair trial due to certain prejudicial answers by government witnesses. Gonzalez also attacks his convictions on the charges arising out of the October 7, 1979 episode as violative of his rights to a speedy trial and due process.

## II. SUFFICIENCY OF THE EVIDENCE

Challenges to the sufficiency of the evidence are measured by the standard delineated in *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B) (en banc),[2] *aff'd on other grounds,* —— U.S. ——, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983):

> It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence.

In making this determination, we must view the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and accept reasonable inferences and credibility choices by the fact-finder, *United States v. Gonzalez,* 719 F.2d 1516, 1521–22 (11th Cir.1983).

### A. *The Conspiracy Charges*

To establish a conspiracy, the government must prove that "there was an agreement between two or more persons to commit a crime, that each conspirator knew of, intended to join, and participated in the conspiracy." *United States v. Glasgow,* 658 F.2d 1036, 1040 (5th Cir. Unit B 1981). An overt act is not required, only proof that the defendant conspired to commit the prohibit-

---

**2.** The Eleventh Circuit has adopted as binding precedent decisions of Unit B of the former Fifth Circuit. *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982).

ed offense. *United States v. Anderson,* 651 F.2d 375, 379 (5th Cir. Unit A 1981).

■ The evidence presented by the government establishes that both Gonzalez and Sanchez were participants in a conspiracy to import cocaine. The evidence shows that Gonzalez on three separate occasions, with Carreras' help, brought cocaine into the United States from the Bahamas; twice the shipments were seized. The evidence also shows that Gonzalez's acts were part of an agreement with other individuals, namely Zaccour and Sanchez, to import cocaine in violation of United States law. Although Gonzalez denied any knowledge of the transactions, the credibility choice between Gonzalez's testimony and that of the government agents was for the jury. *Gonzalez, supra.*

Likewise, the testimony of Agent Sarron establishes Sanchez's role in the conspiracy. In a meeting with Sarron on October 5, 1979, Sanchez actively solicited the agents' assistance in bringing into the United States two suitcases of cocaine that Zaccour was holding in the Bahamas. Sanchez's knowledge of the conspiracy was also evidenced by his conversations with the agents when he related in detail what had happened to the various shipments Gonzalez had brought into the United States.

B. *The July 26, 1979 Attempt to Import*

Both Sanchez and Gonzalez contend that there was insufficient evidence verifying either that the substance involved in the July 26, 1979 shipment was cocaine or that it ever reached the United States. Each also individually challenges the sufficiency of the evidence linking them to the attempt to import.

■ Although the identity of a narcotic must be established beyond a reasonable doubt, its nature may be established through circumstantial evidence. *United States v. Crisp,* 563 F.2d 1242 (5th Cir.1977). Agent Weed testified that, based on eleven years as a drug enforcement agent, he believed that the substance he was helping place in Gonzalez's boat was cocaine. *See United States v. Ferguson,* 555 F.2d 1372, 1373 (9th Cir.1977) (experienced officer may identify substance with which he is familiar). Furthermore, the substance was referred to as cocaine by Gonzalez and Zaccour during the loading and by Gonzalez and Sanchez after it arrived. Based on Weed's testimony, and our obligation to accept reasonable inferences and credibility choices by the fact-finder, *Gonzalez, supra,* we find sufficient evidence to support the jury's determination that the substance was cocaine.

■ The appellants' contention that there is insufficient evidence to show that the cocaine actually reached the United States is also without merit. To be convicted of attempt to import narcotics, the narcotics need not actually reach the United States. *United States v. Perez-Herrera,* 610 F.2d 289, 291 (5th Cir.1980). Moreover, Agent Weed testified that both Gonzalez and Sanchez acknowledged on different occasions that the cocaine had been successfully imported.

■ Gonzalez's actual participation in the attempted importation is amply supported by the evidence. Weed testified to watching Gonzalez place the packages of cocaine in the secret compartments of the boat and then fiberglassing over the areas and painting them. He also related a conversation with Gonzalez on August 8, 1979, in which Gonzalez told him that he had received $10,000 for successfully importing the cocaine.

■ Likewise, we find sufficient evidence under the *Bell* standard to uphold Sanchez's conviction. In the October 5, 1979 meeting with Agent Sarron, Sanchez informed Sarron that Weed had been very helpful in bringing in the July 26th shipment of cocaine. Sanchez had also told Weed in their August 16, 1979 conversation at the convenience store that the cocaine had arrived and that he appreciated Weed's help. From this testimony, the jury could have reasonably concluded that Sanchez had an active part in importing the July 26th shipment.

C. *The September 29, 1979 and October 7, 1979 Shipments*

■ Gonzalez was also convicted of knowingly and intentionally importing co-

caine and possession of cocaine with intent to distribute for each of the two shipments on September 29, 1979 and October 7, 1979. Both shipments were seized when Gonzalez's boat was impounded on the pretext that he had not registered with U.S. Customs upon entering the United States. The September 29th shipment was replaced with the sham cocaine substitute, while Gonzalez was confronted with the fact that cocaine had been found aboard the boat when it was seized on October 7th.

Gonzalez in his testimony denied any knowledge of the shipments or that he knew how to use fiberglass so as to seal the secret compartments where the cocaine was found. Agent Sarron testified, however, that on October 5, 1979, Gonzalez told him that his boat had been impounded and that the cocaine (the sham substitute) had turned out to be no good; at that same meeting, Gonzalez made arrangements for the October 7th shipment. Moreover, Weed testified that he had observed Gonzalez use fiberglass and paint to conceal the secret compartments for the July 26th shipment, further contradicting Gonzalez's testimony. Finally, Sanchez on a number of occasions subsequent to the seizure of the shipments related to both Agents Weed and Sarron that Gonzalez's boat had been impounded but that Gonzalez had been lucky not to have been arrested. Based on this evidence, a jury could have reasonably found Gonzalez guilty of the charges arising out of these shipments.

## III. ADMISSION OF COCONSPIRATOR STATEMENTS

The appellants also contend that the admission into evidence of hearsay statements by coconspirators violated *United States v. James,* 590 F.2d 575 (5th Cir.), *cert. denied* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). Coconspirator statements are admissible only if the court finds that the government has shown by substantial, independent evidence that: (1) a conspiracy existed, (2) the defendant and declarant were both part of the conspiracy, and (3) the statements were made during

the course of and in furtherance of the conspiracy. *James, supra* at 581; *United States v. Yonn,* 702 F.2d 1341 (11th Cir. 1983). The court's findings as to the admissibility of the statements are subject to a clearly erroneous standard of review, *United States v. Bulman,* 667 F.2d 1374, 1379 (11th Cir.), *cert. denied* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982).

At the conclusion of the government's case, the judge heard argument from counsel on the *James* issue and held:

> The Court finds, I think clearly and convincing[ly], certainly by a preponderance of the evidence, and if I were the trier of fact, could possibly [find] by beyond a reasonable doubt that there is substantial independent evidence linking these defendants to a conspiracy, that the statements that the Government has elicited were made by one who had joined in the conspiracy with the party against whom the statement was offered; that the statements were made during the course of that conspiracy, and the statements were made in furtherance of the conspiracy.

The appellants argue that the district court erred because a separate, pretrial *James* hearing should have been held before the jury heard the evidence. A separate *James* hearing prior to the presentation of the government's case-in-chief, however, is not required. *United States v. Roe,* 670 F.2d 956, 962 (11th Cir.1982). The judge, therefore, did not err in deciding the *James* issue until after the government had introduced the statements into evidence. Nor, after reviewing the record, do we find that the trial court erred in determining that the *James* prerequisites for admission of the statements were met in this case.

## IV. PREJUDICIAL REMARKS BY GOVERNMENT WITNESSES

The appellants further allege that they were denied a fair trial because Agents Weed and Sarron made several prejudicial remarks while testifying.[3] Agent Weed, when describing his July 26, 1979 meeting with Zaccour and Gonzalez,

---

**3.** The appellants also point to several remarks

by Weed on cross-examination implying that

testified that Zaccour had shown him false passports, a crime not charged in the indictment; the trial judge gave a curative instruction to the jury to disregard the testimony. Later in his testimony, Weed stated that Sanchez had requested him to go to Colombia to pick up a load of marijuana, which was also not part of the indictment. The judge again gave a curative instruction and asked the jury if anyone could not disregard the evidence; all the jurors indicated they could obey the instruction. Finally, Agent Sarron testified that Gonzalez, while telling him that the cocaine involved in the September 29th shipment had turned out to be bad, stated:

> [Gonzalez] said, "I paid [the fine]. I got the boat back, but the cocaine was no good. We throw it away." He said, "two people, bang bang, get killed because of this."

Agent Sarron's description of the conversation was accompanied by a gesture whereby Sarron pointed his finger at his head as if holding a gun. The court denied the defendants' motion for a mistrial, and instead gave a curative instruction and individually polled the jurors to determine whether they could disregard the statement.

We agree with the district court that the above statements were improper, as any probative value was outweighed by their prejudicial effect. See F.R.Evid. 403. The statement by Agent Sarron, by implying that uncharged murders had taken place, was especially inappropriate; as the trial judge advised government counsel, "In my humble judgment, you made a terrible mistake." The district court, therefore, acted properly in striking the disputed testimony.

Deciding that the testimony was improper, however, is only the first step of our inquiry. We must further decide whether, in light of the court's curative actions, any

resulting prejudice prevented the defendants from receiving a fair trial. In *United States v. Barnes*, 681 F.2d 717 (11th Cir. 1982), the government's witness testified that the defendant had made a death threat, and the trial judge gave a curative instruction to disregard the testimony and collectively polled the jury. We held that although the statement was prejudicial, the trial court's instruction cured any potential prejudice to the defendant. *Id.* at 725.

Similarly, the trial judge here gave an extensive curative instruction:

> Just immediately prior to your recess, there was some testimony which was the result of a statement of what purported to have been said which may have happened because certain of the cocaine was not good.
>
> That is not a proper statement to present to you. The matter is completely irrelevant and has no bearing on this case, whatsoever, and I have to instruct you to completely and unequivocally disregard any inference of any kind that may be drawn from that testimony.
>
> Now, it may mean that one of you will be able to look up to me and say, "Judge I do not think I can do that," and if you cannot, do not hesitate. Do not be reluctant, because, you know, we do not get paid on a case by case basis to do justice, and we will start this case all over if any of you feel that it would prohibit you from giving these defendants a fair trial.

The judge then individually polled the jurors, including further questioning of one juror who defense counsel thought might be equivocating. None of the jurors indicated they could not obey the curative instruction.

Although we strongly disapprove of the government's decision to elicit this testimony,[4] we believe that any potential prejudice

---

there were other investigations involving the appellants. These comments, however, were so oblique as to not be prejudicial and, as the trial judge ruled, were in response to questions by defense counsel which "clearly and unequivocably jarred the door open."

**4.** The government justified the testimony on the ground that Agent Sarron if allowed to continue testifying was going to state that to

his knowledge no one had actually been killed and the statements were simply "macho puffing" by Gonzalez. Even if this were true, it is hard to imagine what probative value such statements would have in showing the existence of a drug conspiracy. We do note, however, that the judge specifically found that the government had acted inadvertently and was not intentionally overreaching.

from Agent Sarron's testimony was cured by the judge's cautious efforts to ensure that no incurable prejudice had occurred. *Barnes, supra.*[5] We hold likewise as to Agent Weed's testimony regarding the unindicted crimes, as the judge carefully instructed the jury to disregard the evidence and polled them to make sure they would obey the instruction. Thus, while we do not approve of the government's or its witnesses' actions, we do not find that any reversible error resulted.

## V. THE SPEEDY TRIAL AND DUE PROCESS CLAIMS

Gonzalez's final contention is that he was in effect arrested on October 9, 1979, when he was read his rights and questioned about the cocaine found aboard his boat, and, because he was not indicted until March 5, 1981, his statutory and constitutional rights to a speedy trial and due process were therefore violated. We find these arguments without merit.

A defendant is not arrested for the purposes of the Speedy Trial Act, 18 U.S.C. 3161(b), until formal charges are pending. *United States v. Varella,* 692 F.2d 1352, 1358 (11th Cir.1982). The same is true for the Sixth Amendment right to a speedy trial. *United States v. McDonald,* 456 U.S. 1, 102 S.Ct. 1497, 1500–02, 71 L.Ed.2d 696 (1982). Therefore, because no formal charges were lodged after Gonzalez was read his Miranda rights and questioned on October 9, 1979, the protections of the Act and the Sixth Amendment are inapplicable. Nor has Gonzalez shown any prejudice arising from the government's delay in bringing formal charges that would arise to a due process violation under the Fifth Amendment. To succeed in a due process claim the defendant must show (1) that substantial prejudice resulted because of the government's delay and (2) that the prosecution intentionally employed the delay to obtain a tactical advantage. *United*

*States v. Avalos,* 541 F.2d 1100, 1107 (5th Cir.1976). The only prejudice that Gonzalez has alleged is the unavailability of the boat to be viewed by the jury,[6] which he contends would have allowed them to observe that the cocaine was hidden from view. The government, however, never alleged that the cocaine was in open view; indeed, part of its case against Gonzalez was that he had stored the cocaine in hidden compartments and sealed them over with fiberglass.

Likewise, Gonzalez has not shown that the government intentionally delayed bringing charges for the purpose of gaining a tactical advantage. The most that Gonzalez has demonstrated is that the government could have brought the importation and possession charges earlier, an argument akin to that which we rejected in *Avalos:* "The appellants assert only that the government knew about the conspiracy before October 1972 and could have initiated the prosecution sooner. The same could be said of almost every complex conspiracy case; this scarcely shows requisite tactical delay." 541 F.2d at 1108. Gonzalez has thus failed to show government misconduct or intentional delay arising to an infringement of his due process rights.

## VI. CONCLUSION

After reviewing the record, we find that the appellants' convictions were supported by the evidence and that the appellants were accorded a fair trial. The convictions and sentences of Sanchez and Gonzalez are AFFIRMED.

---

5. The appellants attempt to distinguish *Barnes* on the ground that *Barnes* involved a "death threat," while here the testimony went to actual killings. Although we do not hold that the distinction is irrelevant for determining the degree of prejudice that resulted from the state-

ment, our inquiry is still the same as in *Barnes:* whether the trial court's actions effectively cured the potential prejudice.

6. The boat had been sold in forfeiture proceedings prior to trial.