**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Carl FREDERICKS,**
**Defendant–Appellant.**

**No. 86–5953.**

United States Court of Appeals,
Eleventh Circuit.

Oct. 12, 1988.

Mel Black, Grove Forest Plaza, Miami, Fla., Merrell F. Sands, Key West, Fla. (court-appointed), for defendant-appellant.

Dexter W. Lehtinen, U.S. Atty., Miami, Fla., Thomas A. O'Malley, Linda Collins Hertz, Harriett R. Galvin, Asst. U.S. Attys., Ft. Lauderdale, Fla., for plaintiff-appellee.

Before HILL and ANDERSON, Circuit Judges, and THOMAS *, Senior District Judge.

HILL, Circuit Judge:

A jury convicted Carl Fredericks of conspiracy to import marijuana and importation of marijuana. Fredericks filed this direct appeal, maintaining that the evidence presented by the government was insufficient to convict him, and that the district court erred in admitting the statements of several persons alleged to have conspired with him.

In evaluating the sufficiency of the evidence presented against the defendant, we must "view the evidence in the light most favorable to the government," *United States v. Sanchez*, 722 F.2d 1501, 1505 (11th Cir.), *cert. denied sub nom. Gonzalez v. United States*, 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984). Ultimately,

---

* Honorable Daniel H. Thomas, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

we must decide whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc), *aff'd on other grounds*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). To be sufficient, the evidence need not "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *Id.* at 549.

Fredericks was a deputy sheriff in the Monroe County Sheriff's Office at the time the alleged importation of marijuana took place. Appellant had a uniform and use of a marked patrol car.

Fredericks was originally linked to two separate importations of marijuana, but at the close of the case the government agreed that the trial court should acquit the defendant as to the count of the indictment which dealt with one of the importations.

According to the government's case, in the remaining transportation scheme the marijuana was brought in on a larger boat, and then transferred to three smaller vessels which took the marijuana to shore. When the smaller craft reached shore, the marijuana was off-loaded onto vans. The government's theory is that Fredericks acted as a lookout and decoy at a bridge overlooking a canal along which the small vessels carried their load to the off-loading site on the shore, and then performed the same function at the off-loading site. His job was to watch for other officers and, if he saw any, to try to keep them from spotting the drug smuggling activity.

To support this theory, the government presented the testimony of four witnesses. One witness, Michael Mingo, was driving one of the three boats on which the marijuana was carried to shore. While he was navigating his boat along a canal, he noticed a green and white, R3–210, "Sheriff's car," R3–186, with "the bubble machine or whatever on the top," *id.*, parked atop a bridge over the canal. *Id.* Mingo saw "a silhouette of a person," R3–193, standing on the bridge and looking in the direction of the boats. R3–194–195. Mingo "believe[d]" R3–194, that the figure on the bridge was wearing a uniform. *Id.* Mingo told the drivers of the two other small craft that he saw a police officer, but "[t]hey said that was all right, go ahead. So I went ahead." R3–193. Mingo saw the car twice more in his trips up and down the canal, but did not see the person again. R3–197, 202. Mingo "believe[d]," R3–209, that the figure on the bridge was white, *id.*, but was unable to say whether the man was tall or little, fat or skinny. R3–210–211.

Robert Estevez, who was helping off-load the marijuana at the shore, testified that he saw a "good sized man," R3–168, "kind of tall, heavy," *id.*, standing beside a car at the off-loading spot. The car was "ordinary," R3–167, but had a "long antenna," *id.*, that "could have been," R3–168, the type used for transmission rather than for AM/FM radio. The man's hair was "maybe dark, call it grayish like, grayish white." *Id.* The man beside the car was "a little bigger than" R3–169, the defendant, and was wearing a uniform, although Estevez "couldn't say," *id.*, whether the uniform was a law enforcement officer's uniform as opposed to a nurse's uniform. Although Estevez feared the shadowy figure was a police officer, the men working alongside Estevez told him "it was all right, to keep working." *Id.*

On cross-examination Estevez explained that he had known the defendant for "a few years," R3–175, but that he had not seen the man beside the car before or since the night the marijuana was off-loaded. Estevez also stated that he would have recognized the defendant had he been the man beside the car:

Q: Is it fair to say that if that was him up there you would have recognized him; wouldn't you?

A: If it was him, yes.

Q: You didn't recognize that as being [the defendant]?

A: No, sir.

R3–175–176. Estevez testified that he was unable to see the face of the person standing beside the car. R3–176.

A third government witness, James Mitchell, testified that he had seen the defendant at the home of Ernest Martin, an organizer for the drug importation operation. Mitchell had captained a boat to Colombia to pick up marijuana, and went to Martin's house to collect his pay. On one visit in Martin's home, Mitchell saw a uniformed police officer, R3–238, who "resemble[d]," R3–239, the defendant. Mitchell thought that the man at the house "wasn't quite as heavy," *id.*, and had hair that "wasn't as white." *Id.* The conversation between Martin and Mitchell revolved entirely around the issue of payment, and did not mention the illicit activity. R3–246. The police officer "neve[r] did say nothing," R3–244, and stood at the door to an inner room while Martin and Mitchell stood at the front door. R3–240.[1]

The government presented a fourth witness, Michael Somberg, a major with the Monroe County Sheriff's office. Somberg had worked with the defendant in the Sheriff's office. Somberg testified that at the time of trial the defendant had "put on a little bit more weight," R4–266, but that his hair was "[a]bout the same color." *Id.* When asked whether anyone in the department "came close in appearance to Carl Fredericks particularly with respect to his size and weight," *id.*, Somberg answered: "[n]o, sir, not to knowledge (sic)." *Id.* Somberg believed that Fredericks' patrol car had exterior lights on the roof, "but [he] really [couldn't] say that it did because everybody ke[pt] telling that it didn't." R4–269. Somberg described other corpulent or large members of the department, explaining how each differed in appearance from the defendant, and noting that some of the officers mentioned had not been employed with the department at the time of the drug importation. R4–313–319.

The defendant did not testify at his trial. By stipulation the government presented the defendant's grand jury testimony. Before the grand jury the defendant testified

that "[e]verybody became friends with Ernest [Martin]," Fredericks' Grand Jury Testimony at 8, and that the Martin and Fredericks families saw each other socially. *Id.* at 8–10. Martin "lived around the corner from," *id.* at 8, Fredericks. The defendant equivocated as to whether he had ever heard that Martin had been involved in drug smuggling:

Q: Have you every heard any rumors in Key West that Ernest Martin was a smuggler?

A: No, sir.

I take that back. I have had rumors about everybody down there smuggling.

Key West is a small island and you hear everything down there.

Ernie Martin himself has a big mouth when he talks. He's a bragger and—whatever, but I may have.

I might have—I couldn't tell you exactly what I heard or whatever, but—

. . . .

[Martin] would be in a group. You know, he would be in the lobby of the Sheriff's Department and he would say—he would show me a diamond ring or something on his finger and say, "You guys are …" you know, "—what are you guys doing working for 15,000 a year …" whatever. . . .

These are the types of things he would say, but actually coming out and saying, Hey, I brought a boat in …" I don't think he's—

*Id.* at 13–14.

Fredericks also told the grand jury that no one in the department resembled Fredericks:

A Grand Juror: Would there be somebody else that may be similar in appearance or—

The Witness: No. I'm the only real heavy one down there.

*Id.* at 16. Fredericks described his patrol car as one "passed down," *id.*, to him from another officer. He explained that the car

---

1. The record does not give the distance between the front door and the inner door.

"didn't have the flashing lights on top," *id.*, but instead had "lights ... set up in the grill." *Id.*

The evidence presented by the government was insufficient to convict Fredericks. Not a single witness was able to identify Fredericks as being present at the drug importation. One witness saw a patrol car, but could not identify the man beside it; another witness saw a large, uniformed man, but an unmarked car. The first witness at most proved that a nondescript figure in a nondescript uniform stood next to a sheriff's car on a bridge overlooking the loaded boats; a second witness proved no more than that a fat figure in a nondescript uniform stood next to a nondescript car at the off-load site. In fact, the witness who observed the corpulent figure said that had the large man been Fredericks, the witness would have recognized him.

The identification by the two witnesses was at best inconclusive: "where all the eyewitnesses to the commission of the offense express substantial doubt about their identification of the defendant, the government must present some connecting or corroborating evidence in order to sustain a conviction." *United States v. Roberts*, 481 F.2d 892, 894 (5th Cir.1973). *See also, United States v. Raffone*, 693 F.2d 1343, 1345 (11th Cir.1982), *cert. denied sub nom. Farese v. United States*, 461 U.S. 931, 103 S.Ct. 2094, 77 L.Ed.2d 303 (1983). In this case the government failed to muster the requisite corroborating evidence.

The government argues that the jury could have found corroboration in the fact that a man resembling Fredericks was visiting in Martin's home at some unspecified date after the drug importation. Fredericks did acknowledge during his grand jury testimony that he had a friendship with Martin, and had visited in Martin's home; nevertheless, while such a relationship may be one factor upon which a jury may rely "along with other evidence," *United States v. Natel*, 812 F.2d 937, 941 (5th Cir.1987) the government cannot convict a defendant solely on friendship with one involved in a crime. *Id.* at 940–41.

Assuming *arguendo* that Somberg's testimony proved that no one on the force resembled Fredericks, Somberg's testimony was nonetheless insufficient as corroboration. Only the witness who could not connect the figure to the sheriff's office, by type of uniform or car, noticed the shadowy observer's large size. Fredericks could not have been the only large man in Key West. The same fallacy applies to the government's contention that Fredericks himself corroborated the testimony when he identified himself as the largest man on the force.

Finally, the government argues that Fredericks corroborated the testimony when he stumbled at grand jury questioning as to whether he had heard that Martin dealt in drugs. Any such minor slip cannot constitute proof that defendant did in fact participate in the conspiracy centered around the specific drug importation described in the indictment.

Defendant maintains that the district court committed an additional error when it admitted the statements of those alleged to be defendant's coconspirators. Since we hold that the evidence was insufficient to demonstrate that the defendant was guilty of any offense, we need not address this second alleged error.

We conclude that no reasonable trier of fact could have determined that the evidence established defendant's guilt beyond a reasonable doubt. Consequently, the conviction of the defendant is REVERSED.