**UNITED STATES of America**

v.

**Andrew S. SHANKMAN, and Mary Jane Pedrick.**

**No. Crim A. CR297–10.**

United States District Court, S.D. Georgia, Brunswick Division.

June 4, 1998.

---

Jeffrey J. Buerstatte, Assistant U.S. Attorney, Savannah, GA, for Plaintiff.

John J. Ossick, Jr., Kingsland, GA, John Eric Bumgartner, Whelchel, Brown, Readdick & Bumgartner, Brunswick, GA, James A. Yancey, Jr., James V. Pleasants, Brunswick, GA, M. Theodore Solomon, II, Solomon & Edgar, Alma, GA, W. Grady Pedrick, for Defendants.

### ORDER

ALAIMO, District Judge.

Mary Jane Pedrick ("Pedrick") was convicted by a jury of one count of conspiracy in violation of 18 U.S.C.A. § 371 (Supp.1998) and eighty-nine counts of mail and wire fraud in violation of 18 U.S.C.A. §§ 1341 & 1343 (Supp.1998). Currently before the Court are Pedrick's Motion for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29 and her Motion for a New Trial pursuant to Federal Rule of Criminal Procedure 33. For the following reasons, Pedrick's Motion for Judgment of Acquittal will be **DENIED,** and Pedrick's Motion for New Trial will be **GRANTED.**

### FACTS

Pedrick was tried together with Co–Defendant, Andrew S. Shankman ("Shankman"). The charges against the Defendants stemmed from the operation of Shankman/Davidson Psychiatric Management, Incorporated ("Shankman/Davidson"). Shankman performed psychiatric services, and Thomas Davidson ("Davidson") coordinated the administrative aspects of the firm.

Shankman/Davidson employed Pedrick as the chief therapist.

Shankman/Davidson provided psychiatric services to patients who either came to an office of the firm or were in nursing homes. Therapists were employed to travel to nursing homes throughout Florida and Georgia. The main office of Shankman/Davidson, located on St. Simons Island, Georgia, provided each therapist with a daily "flow sheet" of patients to see. The therapist would indicate on the flow sheet which patients they had seen and the therapy rendered. After the therapist finished seeing the patients listed on the sheet, the flow sheets were delivered to the main office to be assigned billing codes.[1] The employees in the main office were trained in the billing process and were responsible for assigning the billing codes. Medicare and Medicaid payments provided the largest source of revenue for Shankman/Davidson.

The Government investigated the firm for fraudulent claims against government insurance programs, specifically, Medicare, Medicaid, and CHAMPUS.[2] The Government contended that therapists were seeing patients without the supervision of a licensed psychiatrist, in violation of the insurance programs' requirement that a psychiatrist be present. The Government's allegations of fraudulent claims also were based on the extraordinary number of patients seen each day, improper use of billing codes when making claims to the Government programs, and false entries in patients' records. After investigation, the Government charged Pedrick with conspiracy to commit mail and wire fraud and with the commission of mail and wire fraud.[3] During the trial, the jury heard testimony from the Defendants,[4] several of Shankman's former patients, undercover agents, and expert witnesses. After deliberation, the jury returned guilty verdicts against both Shankman and Pedrick on all counts.

---

1. Billing codes are five digit numbers used by Government programs and insurance companies to describe certain services.

2. CHAMPUS is the Civilian Health and Medical Program of the Uniformed Services and is designed to provide benefits for individuals with specified relationships with the armed services.

3. Shankman/Davidson filed its Medicare and Medicaid claims electronically. Shankman/Davidson sent CHAMPUS claims through the United States mail.

4. Co–Defendants, Thomas Davidson and Michael Davidson, who had previously pled guilty, testified at the trial, as well as both Shankman and Pedrick.

Pedrick now claims that, due to the insufficiency of the evidence presented by the Government at trial on the conspiracy charge, she is entitled to either a judgment of acquittal or a new trial. Pedrick also contends that she is entitled to a new trial because the Government improperly relied upon evidence that she had violated civil regulations. The Government, however, asserts that the weight of the evidence in this case precludes the Court from granting Pedrick's motions.

## DISCUSSION

### I. Federal Rule of Criminal Procedure 29

 When evaluating a Rule 29 motion for judgment of acquittal, a court must consider all evidence presented at trial and view that evidence in the light most favorable to the Government. *United States v. Sanchez,* 722 F.2d 1501, 1505 (11th Cir.), *cert. denied, Gonzalez v. United States,* 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984); *United States v. Blackston,* 547 F.Supp. 1200, 1205 (S.D.Ga.1982). The court also must accept reasonable constructions of the evidence and credibility choices made by the jury. *Sanchez,* 722 F.2d at 1505 (citations omitted); 9A *Fed.Proc., L.Ed.,* Criminal Procedure § 22:2095 (1993).

 The proper standard to apply "in deciding a motion for judgment of acquittal is whether reasonable minds can conclude that the evidence is inconsistent with any hypothesis of the accused's innocence." *Blackston,* 547 F.Supp. at 1205. If there is substantial evidence to support a guilty verdict as to each element of the crime, then a judgment of acquittal may not be granted. *Id.;* 9 *Fed.Proc., L.Ed.,* Criminal Procedure § 22:1339 (1993). "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." *United States v. Berki,* 936 F.2d 529, 532 (11th Cir.), *cert. denied,* 503 U.S. 988, 112 S.Ct. 1677, 118 L.Ed.2d 395 (1992) (quoting *Sanchez,* 722 F.2d at 1505).

**5.** The Eleventh Circuit, in the *en banc* decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions

### II. Federal Rule of Criminal Procedure 33

 Rule 33 of the Federal Rules of Criminal Procedure states "[t]he court on motion of a defendant may grant a new trial to that defendant if required in the interests of justice." The decision whether to grant a new trial is within the sound discretion of the trial judge. *United States v. Champion,* 813 F.2d 1154, 1170 (11th Cir.1987); *United States v. Martinez,* 763 F.2d 1297, 1312 (11th Cir.1985). The defendant must establish the grounds for a new trial. *United States v. Geders,* 625 F.2d 31, 32 (5th Cir.1980);[5] 9A *Fed.Proc., L.Ed.,* Criminal Procedure § 22:1655 (1993). Courts should exercise "great caution" when granting new trials and new trials only should be granted in "exceptional cases." *United States v. Sjeklocha,* 843 F.2d 485, 487 (11th Cir.1988) (citations omitted); *Martinez,* 763 F.2d at 1313.

 "On a motion for a new trial based on the weight of the evidence, the court need not view the evidence in the light most favorable to the verdict. It may weigh the evidence and consider the credibility of the witnesses." *Martinez,* 763 F.2d at 1312 (citations omitted). The evidence, though, must weigh heavily against the verdict, "such that it would be a miscarriage of justice to let the verdict stand." *Id.* at 1313 (citations omitted). New trials have been granted where the credibility of the Government's witnesses has been impeached and the Government's case has been marked by uncertainties and discrepancies. *Martinez,* 763 F.2d at 1313.

### III. Conspiracy

Pedrick contends that the evidence presented at trial was insufficient for a jury to convict her of conspiracy to commit mail and wire fraud. (Pedrick Renewed Mot. for Acquittal and New Trial of 1–2). She contends that the evidence only showed unprofessional and unethical behavior that did not rise to the level of a criminal conspiracy. (*Id.* at 2). The Government, however, contends that Pedrick was an active and vital member of the conspiracy, and that sufficient evidence was

of the former Fifth Circuit rendered prior to October 1, 1981.

presented at trial for a reasonable jury to find her guilty. (Govt's Resp. to Pedrick's Mots. for Acquittal and New Trial at 5–25).

■ Construing the evidence in the light most favorable to the Government, there may have been sufficient evidence presented at trial for a reasonable jury to find Pedrick guilty of the charges against her. Hence, Pedrick is not entitled to a judgment of acquittal. However, when the Court independently evaluates the evidence and the credibility of the witnesses, the Court is left with a reasonable doubt about Pedrick's guilt. *See Martinez,* 763 F.2d at 1312. The evidence weighs heavily against finding that Pedrick knew of any agreement or had the specific intent to defraud the United States. Accordingly, Pedrick should be granted a new trial.

■ In order for a defendant to be convicted of conspiracy to commit mail and wire fraud, the Government must prove beyond a reasonable doubt: 1) the existence of an agreement to execute a scheme to defraud, and 2) that the mail or wire systems were used to further the scheme. *United States v. Smith,* 934 F.2d 270, 274 (11th Cir.1991); *United States v. Hawkins,* 905 F.2d 1489, 1497 (11th Cir.1990), *cert. denied,* 498 U.S. 1038, 111 S.Ct. 707, 112 L.Ed.2d 696 (1991). Direct evidence of the conspiracy or agreement is not required. *United States v. Massey,* 89 F.3d 1433, 1439, *reh'g denied,* 98 F.3d 1355 (11th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 983, 136 L.Ed.2d 865 (1997); *Hawkins,* 905 F.2d at 1497. "Mail fraud under 18 U.S.C. § 1341 is the intentional participation in a scheme to deprive another of money or property, and use of the mails in furtherance of that scheme." *United States v. Ethridge,* 948 F.2d 1215, 1216 (11th Cir.1991). The specific intent required to convict an individual of conspiracy to commit mail or wire fraud is the intent to defraud another, not the specific intent to use the mail or wire systems. *United States v. Simon,* 839 F.2d 1461, 1469 (11th Cir.), *cert. denied,* 488 U.S. 861, 109 S.Ct. 158, 102 L.Ed.2d 129 (1988); *Marshall v. City of Atlanta,* 195 B.R. 156, 175 (N.D.Ga.1996). In order to convict Pedrick of the charges against her, the Government must demonstrate that she knew of the illegal scheme and voluntarily participated in the scheme.

*See United States v. Parker,* 839 F.2d 1473, 1478 (11th Cir.1988) (finding insufficient evidence that salespersons had conspired with the principals).

The essence of the conspiracy charged in this case is that there was an agreement at Shankman/Davidson to defraud the United States through improper billing. The nerve center of the conspiracy was the main office of Shankman/Davidson, where the billing clerks assigned billing codes to the flow sheets submitted by the therapists and then submitted the bills to the appropriate Government agencies. The employees in the main office were trained in the billing process and were responsible for assigning the billing codes. (Trial Tr. II–223, II–237). Shankman and Davidson selected the billing codes that were used. (*Id.* at II–237). None of the therapists ever participated in billing. (*Id.* at II–223). Pedrick testified that she had no knowledge of the billing system at Shankman/Davidson, and no evidence was presented to contradict that assertion. (*Id.* at III–306).

The only evidence presented regarding Pedrick's express knowledge of, or participation in, the conspiracy to commit mail and wire fraud was Pedrick's own testimony that she did not know of, nor participate in, discussions regarding, nor intentionally further, the conspiracy. (*Id.* at III–131–32). There was no other testimony or evidence to the contrary. During the initial investigation of this matter, Pedrick was not mentioned by the staff of Shankman/Davidson as being involved in the scheme to defraud. (*Id.* at II–24–25, II–229–230). In fact, Pedrick was rarely in the office where the billing occurred due to her rigorous work schedule that required her to be on the road and visiting patients Monday through Friday from six in the morning until seven or eight in the evening. (*Id.* at III–303, III–311).

The Government argues that Pedrick was a knowing member of the conspiracy because of the position she held within Shankman/Davidson and the fact that she knew Shankman/Davidson had been sanctioned once before for improper Medicaid billing practices. However, without additional evidence, neither of these allegations demon-

strates that Pedrick either knew of the agreement to defraud the United States by committing mail and wire fraud, or that she voluntarily joined the conspiracy.

Indeed, Pedrick was the chief therapist at Shankman/Davidson. (*Id.* at I–10, I–84, II–213, II–214). As chief therapist, Pedrick took new therapists to their assigned locations and, at times, she would contact all the therapists at Shankman's request. (*Id.* at I–162, II–372, III–308–10, III–344). Additionally, Pedrick would listen to the concerns of the other therapists regarding the number of patients they were required to see.[6] (*Id.* at II–269, II–382, II–384). Later, Pedrick was promoted to Vice President of Clinical Operations. (*Id.* at II–315, II–337). However, this promotion was in name only and carried with it no additional responsibilities or increased salary. (*Id.* at II–315, III–317). As discussed before, Pedrick was rarely, if ever, in the main office of Shankman/Davidson. (*Id.* at III–303, III–311). Pedrick had no knowledge of the billing practices and never assigned billing codes. (*Id.* at III–306). Pedrick is not a co-conspirator because she received the title of Vice President of Clinical Operations. There must be some evidence that she either knew of, or was deliberately indifferent to, the existence of a conspiracy. *See Simon,* 839 F.2d at 1469.

The Government is correct that Pedrick was present at an hour-long meeting where Shankman was accused of improper Medicaid billing practices. (Trial Tr. I–106, I–139, III–298). However, Pedrick never participated in any further proceedings regarding those allegations. (*Id.* at I–139, III–299). Pedrick believed that the matter had been resolved when Shankman/Davidson paid the fine and discontinued seeing Medicaid patients. (*Id.* at III–302). Her belief that the illegal activities had ceased prevents her from being charged with knowledge of subsequent wrongdoing. *See United States v. Jakeway,* 783 F.Supp. 590, 595 (M.D.Fla. 1992) (holding that an individual who had notice of one incident of wrongdoing, that he thought was resolved, is excused from being charged with knowledge of later wrongdoing).

The Government also contends that Pedrick was rewarded for her participation in the conspiracy by her annual salary of $46,501.04, (Trial Tr. II–339), and her company BMW. (*Id.* at II–212, II–243). The BMW, however, replaced her company Toyota Camry that had been driven over one hundred and eighty thousand miles. (*Id.* at II–244, III–316). Pedrick did not have any input into the decision of what car she would be given. (*Id.* at II–243–44, III–315–16). Davidson testified that the lease on the BMW was less than the payments had been for the Camry, and the decision was made on that basis. (*Id.* at III–337). Additionally, Pedrick's benefits were small when compared to the other conspirators. Dr. Shankman's annual salary was $206,687, (*Id.* at II–339), and the company provided him with two BMWs. The Davidsons had four cars between the two of them, a Mercedes and three BMWs. Furthermore, Shankman and the Davidsons used their American Express cards to make personal purchases, and Shankman/Davidson paid the bills. The fact that Pedrick received an annual salary and the use of a company car does not establish that she voluntarily participated in any conspiracy.

Regardless of the fact that there was no evidence connecting Pedrick to the conspiracy, the Government argued at trial that Pedrick was actively involved in the conspiracy to commit mail and wire fraud. However, the extent of Pedrick's wrongdoings consisted of making the same notation for two patients, (*Id.* at II–59, II–60), reporting services rendered on deceased patients, (*Id.* at II–214), recording patient notes for a deceased therapist, (*Id.* at II–267), and the fact that she submitted flow sheets indicating she had seen twenty to forty-eight patients in a single day. (*Id.* at III–131–32). However, none of these events demonstrates a specific intent to defraud the United States or to participate in a conspiracy to do so. *See Parker,* 839 F.2d at 1479–81 (holding that innocent misrepresentations by salespersons are insufficient to demonstrate specific intent

---

6. Pedrick's response to this concern was to tell the therapists to do the best that they could. (Trial Tr. II–269, II–384). She never encour-

aged, or even suggested, to a single therapist that he/she commit fraud.

to defraud). The Court will address each of these alleged fraudulent acts independently.

At times Pedrick would make the same patient note for two or more patients. Pedrick admitted that sometimes she fell behind in her patient notes and would have to rely on her memory to complete the notes. (*Id.* at II–66, II–297, III–329). However, she was not the only therapist at Shankman/Davidson who did not make all patient notes contemporaneously with the services. *Id.* at II–283–84, II–382). The pace of therapy demanded by Shankman/Davidson placed all its therapists in this situation. (*Id.* at II–283–84, II–382). At other times, Pedrick would use the same comments to describe several patients, especially those in group therapy, as a time saving device. (*Id.* at III–357–58). Regardless of any of these mistakes, or short cuts, in patient notes, these notes were not used in the billing scheme at Shankman/Davidson. (*Id.* at II–290). Instead, the main office used the therapists' flow sheets to determine billing. (*Id.* at II–237, II–387). Patient notes are made for the benefit of the patients and the convenience of their care givers. (*Id.* at II–297). So, any mistakes, or even fraudulent entries, in patient notes would not further the overall conspiracy to commit mail and wire fraud and do not demonstrate any intent to defraud.

It is true that Shankman/Davidson billed for deceased individuals and, on a few occasions, Pedrick checked off that she had seen patients after they had died.[7] (*Id.* at III–134–35, III–336). However, there were also other instances in which Government programs were billed for services rendered to deceased patients by Shankman and therapists other than Pedrick. (*Id.* at III–134–35, III–160, III–336). There are many explanations for these mistakes. Chuck Neugebauer, the billing clerk at Shankman/Davidson, indicated that it could have

been a mistake in the correlation of the flow sheets with the account numbers in the office. (*Id.* at 1–43). The flow sheets were created in the main office and then sent to the therapists. (*Id.* at II–283). Often these sheets were not updated to reflect patients who had died recently. (*Id.*) Additionally, Pedrick and the other therapists often provided group therapy. When completing a flow sheet after a group session with fifteen to twenty patients, it was difficult to recall each individual patient. (*Id.* at III–337–38). Mistakenly reporting that a therapist had treated a deceased individual is tragic, but does not demonstrate any intent to defraud. Moreover, the other therapists who accidentally reported that they saw deceased patients were not charged with conspiracy. (*Id.* at II–283, III–337).

Pedrick also admits that she recorded patient notes, after the date of the therapy, for Michael Easton ("Easton"), a deceased therapist. (*Id.* at II–267). Easton died unexpectedly one weekend and Pedrick took over his patients. (*Id.* at II–289–90, III–330). She retrieved his files and realized that his patient notes were not up to date. (*Id.* at II–290, II–330). Knowing that Shankman/Davidson already had billed for the services, she completed the patient notes, utilizing Easton's own notes made on his flow sheets and notebook. (*Id.* at II–290, III–332–33). There is no allegation that she falsified the notes, and she made no attempt to conceal the fact that she had filled in Easton's notes. (*Id.* at II–290, II–298, III–334). This behavior, although arguably improper,[8] did not further the conspiracy, nor does it provide evidence of an intent to defraud, since Easton's patients had been billed at the time Pedrick completed the notes, and patient notes were not used in the billing process. (*Id.* at III–332–35).

**7.** Michael Davidson testified that Pedrick billed "numerous times" for deceased patients. (Trial Tr. II–229). However, FBI Agent Bennett testified that Pedrick only did so twice in regards to the same patient. (*Id.* at III–134–35). Michael Davidson's testimony should be given reduced weight. He was testifying in hopes of having the Government move to reduce his sentence. (*Id.* at 11–232–234). In his initial interviews with the FBI, he stated that, "on occasion," Shankman/Davidson would bill for deceased patients,

but never mentioned Pedrick's name. (*Id.* at II–231). It was not until after the plea bargain was reached and Pedrick was going to trial that Davidson mentioned Pedrick's involvement in billing for deceased patients. (*Id.* at II–229–230).

**8.** Another therapist, Cynthia Leasure, thought that if Pedrick did use Easton's own notes in completing the patient notes, she did nothing improper. (Trial Tr. at II–297).

The Government contends that on several days Pedrick could not possibly have seen the number of patients reported on her flow sheets. However, there are several flaws in that contention. On days where Pedrick was alleged to have seen too many patients, the Government programs had been billed for individual psychotherapy, a service that a physician must perform. (*Id.* at III–132). No allegation was made that Pedrick was responsible for assigning the billing codes for the services she rendered, nor that, on these particular days, she directed the office to bill for individual psychotherapy. (*Id.* at III–161). The testimony clearly established that Shankman/Davidson's main office, not the therapists, assigned the codes to flow sheets. (*Id.* at III–171). The office reported services that could not have been rendered by Pedrick. She was not a physician and was not qualified to perform the billed services. Furthermore, on at least two of those days, Pedrick testified that it was not her handwriting on the flow sheets, and FBI Agent Bennett agreed that the handwriting on the flow sheets did not seem to match that of Pedrick's. (*Id.* at III–167–68, III–322–25). Although the Court is not privileged to know what happened on those days, Pedrick could have performed different services, such as group therapy, and it would have been possible for her to see that many patients in a single day, yet the main office still billed for psychotherapy. Regardless of what services were rendered, the main office of Shankman/Davidson intentionally billed for services that could not have been performed. In the absence of any evidence that Pedrick knew the main office was making these billing decisions, the Government has not shown that Pedrick had any specific intent to defraud, based upon these flow sheets.

After considering the evidence presented at trial, the Court finds that Pedrick is entitled to a new trial on the basis that the evidence was insufficient to support her convictions. The Government did not demonstrate that Pedrick was a knowing participant in the conspiracy to commit mail and wire fraud. Furthermore, the instances of wrongdoing do not evidence any specific intent to defraud but, instead, appear to be innocent mistakes.

## IV. *Violation of Civil Regulations*

Pedrick contends that the evidence that she made mistakes on documents or failed to complete patient notes in a timely manner only amounts to a violation of civil regulations and does not warrant criminal sanctions. Pedrick admits that she reported services rendered for patients who had died and completed patient notes long after the services were performed. (*Id.* at III–329, III–337–38). She claims that the Government's reliance on this evidence warrants the grant of a new trial because her substantial rights were affected.

 A defendant who merely has violated a civil regulation is not guilty of any federal crime. *Jakeway*, 783 F.Supp. at 594. In order for the court to grant a new trial based on the prosecution's reliance on civil regulations, the violations must be presented in an impermissible fashion, and the defendant's substantial rights must be affected. *United States v. Stefan,* 784 F.2d 1093, 1098 (11th Cir.), *cert. denied,* 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 706 (1986); *Jakeway,* 783 F.Supp. at 596 (citing *United States v. Hawkins,* 905 F.2d 1489, 1493 (11th Cir. 1990); *United States v. Stout,* 667 F.2d 1347, 1352 (11th Cir.1982)). A reference to a violation of civil regulations is improper if its "purpose or effect is to suggest to the jury that it could find a defendant guilty by reason of his violation of the regulation." *Jakeway,* 783 F.Supp. at 594. *See also United States v. Christo,* 614 F.2d 486, 492, *reh'g denied,* 618 F.2d 1390 (5th Cir.1980) (finding reversible error when prosecution discussed the defendant's civil violations).

 In this case, the Government's reliance on violations of civil regulations warrants a new trial. The Government presented the evidence regarding the civil violations in such a fashion that the jury could have thought it was evidence that Pedrick was involved in the conspiracy. In fact, the Government failed to distinguish between the flow sheets and the patient notes. Any mistakes, or even fraudulent entries, in patient notes would not have affected the overall conspiracy. As discussed above, the patient notes are for the sole benefit of the patient. On the other hand, Shankman/Davidson re-

lied on the flow sheets and billing codes to commit the conspiracy.

The Court did charge the jury that "... even if you find the claims [to Medicare, Medicaid and CHAMPUS] were not allowable under the applicable regulations, a defendant cannot be convicted of a crime merely for breaching civil statutes or regulations applicable to his conduct." (Tr. Jury Charge at 34). However, that charge failed to address the specific prejudice created by the Government. Pedrick's alleged violations of civil regulations did not involve claims to the Government programs, but stemmed from her mistakes in patient notes. The Government confused the jury with the fraud committed by the billing procedures and practices of Shankman/Davidson and the potential regulatory violations made by Pedrick in her patient notes. The effect of the Government's presentation was that the jury could find Pedrick guilty because of these alleged violations. This confusion affected Pedrick's substantial rights and warrants the grant of a new trial. *See Christo*, 614 F.2d at 492; *Jakeway*, 783 F.Supp. at 594.

### V. *Separate Trials*

■ The Court has a "continuing duty at all stages of the trial to grant a severance if prejudice appear[s]." *United States v. Johnson*, 478 F.2d 1129, 1134 (5th Cir.1973) (quoting *Schaffer v. United States*, 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921, 925, *reh'g denied*, 363 U.S. 858, 80 S.Ct. 1605, 4 L.Ed.2d 1739 (1960)). Defendants in this case made motions to sever before the trial that were denied by Magistrate Judge Graham.

■ Where co-defendants are named in a joint indictment, the general rule is that they will be tried together in a joint trial. *United States v. Gonzalez*, 804 F.2d 691, 694 (11th Cir.1986), *reh'g denied*, 818 F.2d 871 (1987) (citing *United States v. Esle*, 743 F.2d 1465, 1476 (11th Cir.1984), *reh'g denied*, 755 F.2d 176 (1985)). That is especially true when the defendants have been indicted for conspiracy. *Id.* (citing *United States v. Alvarez*, 755 F.2d 830, 857 (11th Cir.1985), *cert, denied*, 482 U.S. 908, 107 S.Ct. 2489, 96

L.Ed.2d 380 (1987)). However, in certain circumstances, the Court may sever the defendants and conduct separate trials pursuant to Federal Rule of Criminal Procedure 14. Rule 14 requires the Court to "balance the right of the defendants to a fair trial, absent the prejudice inherent in a joint trial, against the interests of judicial economy and efficiency." *Id.* (citing *United States v. Hewes*, 729 F.2d 1302, 1318, *reh'g denied*, 734 F.2d 1481 (11th Cir.1984), *cert. denied*, 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985)). Separate trials are warranted when the defendant is unable to get a fair trial and has suffered "compelling prejudice" against which the Court could not protect. *Id.* (citing *United States v. Magdaniel–Mora*, 746 F.2d 715, 718 (11th Cir.1984), *reh'g denied*, 751 F.2d 1261 (1985); *United States v. Berkowitz*, 662 F.2d 1127, 1134 (5th Cir. Unit B Dec.7, 1981) [9]).

■ One instance when separate trials are warranted is when there is a gross disparity in the weight of the evidence presented against the various codefendants. *Zafiro v. United States*, 506 U.S. 534, 539, 113 S.Ct. 933, 938, 122 L.Ed.2d 317, 325 (1993) (discussing risks of joint trials); *United States v. Paul*, 150 F.R.D. 696, 698 (S.D.Fla.1993) (citing *United States v. Garner*, 837 F.2d 1404 (7th Cir.1987), *cert. denied*, 488 U.S. 898, 109 S.Ct. 244, 102 L.Ed.2d 232 (1988)). When the majority of the evidence presented at a joint trial is directed at the crimes committed by one defendant, there is a risk that the co-defendant will suffer "spillover" prejudice. *United States v. Schlei*, 122 F.3d 944, 983, *reh'g denied*, 132 F.3d 1462 (11th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1523, 140 L.Ed.2d 674 (1998); *Alvarez*, 755 F.2d at 857. However, the mere fact that the evidence is stronger as to one defendant is not sufficient to warrant separate trials, in the absence of the other defendant suffering "compelling prejudice." *Alvarez*, 755 F.2d at 857.

The test for compelling prejudice is whether under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jury to follow the

---

9. Decisions of the former Fifth Circuit, Unit B, rendered after September 30, 1981, are binding

precedent in this circuit. *Stein v. Reynolds Securities, Inc.* 667 F.2d 33, 34 (11th Cir.1982).

admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct. *Hewes,* 729 F.2d at 1319 (quoting *United States v. Kabbaby,* 672 F.2d 857, 861 (11th Cir.1982)). *See also United States v. Cross,* 928 F.2d 1030, 1039 (11th Cir.1991), *cert. denied,* 502 U.S. 1060, 112 S.Ct. 941, 117 L.Ed.2d 112 (1992). Compelling prejudice demands more than showing that the defendant would have had a better chance of acquittal if tried alone. *Hewes,* 729 F.2d at 1319.

■■■ To determine whether a particular defendant has suffered compelling prejudice from spillover evidence, the Court should look to the jury's verdict. *Schlei,* 122 F.3d at 983. If the verdict demonstrates that the jury "meticulously sifted the evidence," such as when the jury acquits on various counts, then it is unlikely that spillover prejudice occurred. *Schlei,* 122 F.3d at 984; *United States v. LeQuire,* 943 F.2d 1554, 1563 (11th Cir.1991), *cert. denied,* 505 U.S. 1223, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992); *Hewes,* 729 F.2d at 1319; *United States v. Phillips,* 664 F.2d 971, 1017 (5th Cir. Unit B Dec.28, 1981), *superseded on other grounds, United States v. Huntress,* 956 F.2d 1309 (5th Cir.1992); *Kabbaby,* 672 F.2d at 861. If the jury returns a guilty verdict for all defendants on all counts, the Court may conclude that the jury did not sort the evidence appropriately, and separate trials are warranted. *United States v. Diaz–Munoz,* 632 F.2d 1330, 1336–37 (5th Cir. 1980). *But see United States v. Hernandez,* 921 F.2d 1569, 1580 (11th Cir.), *cert, denied,* 500 U.S. 958, 111 S.Ct. 2271, 114 L.Ed.2d 722 (1991) (finding no spillover prejudice when the jury returned all guilty verdicts). Another factor the Court should consider in evaluating the risk of spillover prejudice is whether the cautionary or remedial instructions given can correct any prejudice. *Alvarez,* 755 F.2d at 858 (finding no error when the

district court denied a motion to sever when multiple remedial instructions were given).

■■■ In this case, Magistrate Judge Graham, after an evidentiary hearing, denied Defendants' pretrial motions for severance.[10] *United States v. Shankman,* No. CR296–10 (S.D.Ga. June 9, 1997) (order denying Defendants' Motions to Sever). The arguments presented to Judge Graham were that Defendant, Shankman, alone was charged with the illegal distribution of controlled substances and that Defendants, Shankman and Thomas Davidson, might present inconsistent defenses at trial. *Id.* at 6, 11. Based on the record before him at that time, Judge Graham properly denied the motions to sever. His decision was consistent with the general presumption that defendants who were jointly indicted for conspiracy should be tried jointly. *Id.* at 4. Moreover, the charges against Defendant, Shankman, for the distribution of controlled substances were intertwined with the overall conspiracy and no prejudice would be suffered by not severing them. *Id.* at 6–9. Furthermore, neither Defendant, Shankman, nor Defendant, Thomas Davidson, presented any evidence to support their allegation that they would raise inconsistent defenses at trial, and cautionary instructions could address any possible prejudice. *Id.* at 12–14.

During the trial, however, a different picture emerged. As the result of her joint trial with Shankman, Pedrick did not have a fair trial and suffered compelling prejudice. The overwhelming majority of the evidence presented by the Government was directed at Shankman.[11] Very little evidence was presented regarding Pedrick's behavior and, as discussed above, the great weight of the evidence does not support her guilty verdicts. Considering the guilty verdicts on all counts, there is no evidence that the jury "meticulously sifted the evidence." *See Diaz–Munoz,* 632 F.2d at 1336–37. *See also Schlei,* 122 F.3d at 984; *LeQuire,* 943 F.2d at 1563; *Hewes,* 729 F.2d at 1319; *Phillips,* 664 F.2d

---

**10.** Defendants, Shankman, Thomas Davidson and Michael Davidson, made individual motions to sever. Defendant, Pedrick, adopted the motions.

**11.** In fact, excluding Pedrick's testimony, the Official Court Reporter's transcript of this case filled over eight hundred and fifty pages, and Pedrick's name is found on fewer than fifty pages.

at 1017; *Kabbaby*, 672 F.2d at 861. Moreover, the jury failed to heed the cautionary instructions given by the Court to consider each defendant and the evidence against that defendant separately.[12] In accordance with the Court's duty to correct any compelling prejudice stemming from a joint trial, Pedrick will be granted a new separate trial. *See Schaffer*, 362 U.S. at 516, 80 S.Ct. at 948, 4 L.Ed.2d at 925; *Johnson*, 478 F.2d at 1134.

**CONCLUSION**

Having considered fully the positions asserted by the parties in this matter, the Court concludes that Pedrick's Motion for Judgment of Acquittal will be **DENIED** and Pedrick's Motion for New Trial will be **GRANTED**.

12. Specifically the Court charged the jury as follows: "a separate charge or offense is charged against one or more of the defendants in each count of the Superceding indictment. Each offense and the evidence pertaining to it must be considered separately, which means that the case of each defendant must be considered separately and individually." (Tr. Jury Charge at 30).